### In re PRINCE & WALTER.

(District Court, M. D. Pennsylvania. July 28, 1904.)

#### No. 43.

**1. BANKRUPTCY—MORTGAGES—LIEN—EXTINGUISHMENT.**

Under Bankr. Act July 1, 1898, c. 541, § 67d, 30 Stat. 564 [U. S. Comp. St. 1901, p. 3451], providing that liens given or accepted in good faith, etc., which have been recorded according to law, shall not be affected by the act, where real estate of a bankrupt was ordered to be sold subject to a first mortgage, and the trustee, who was the holder of a second mortgage thereon, obtained special leave to bid as a lien creditor, and the referee's original order of sale expressly provided that the land should be sold subject only to the first mortgage, the lien of the second mortgage was divested by the sale.

2. SAME—TAXES—STATE STATUTES—CONSTRUCTION.

Act Pa. June 4, 1901, § 2 (P. L. 364), providing that all taxes that may thereafter be lawfully imposed or assessed on any property shall be a first lien thereon, etc., and that such lien shall have priority to, and be fully paid and satisfied out of the proceeds of, any judicial sales of the property, etc., is prospective only, and does not give priority to taxes over a mortgage which was a lien before its passage.

3. SAME—ORDER OF SALE—LIENS—VACATION.

Where real estate of a bankrupt was sold subject only to a first mortgage thereon, such sale operated to divest a tax lien on the property, as against a purchaser on the faith of the record, notwithstanding Act Pa. June 4, 1901, § 32 (P. L. 375), by which all taxes are made a continuing lien on property, notwithstanding a judicial sale, unless the proceeds of the sale are sufficient to pay them.

4. SAME—ASSETS—PAYMENT OF CLAIMS—PRIORITY—TAXES.

Under Bankr. Act July 1, 1898, c. 541, § 64, 30 Stat. 563 [U. S. Comp. St. 1901, p. 3448], providing the order of priority in which debts or charges against the estate of a bankrupt are to be paid, and declaring that the court shall order the trustee to pay all taxes legally due and owing by the bankrupt in advance of the payment of the dividends to creditors, where state taxes assessed on the property of a bankrupt were not payable out of the proceeds of the bankrupt's real estate, they were entitled to payment as a preferred claim from the proceeds of a sale of the bankrupt's personalty, whether they were assessed prior to, or during the continuance of, the bankruptcy proceedings.

5. SAME—PROOF OF CLAIM.

Since taxes assessed against the property of a bankrupt during the administration of his estate are matters of public record, they need not be proved as a claim against the bankrupt's estate in order to be allowed.

6. SAME—PARTNERSHIP—EXEMPTIONS.

Where a partnership is adjudged a bankrupt, in Pennsylvania, the partners are not entitled to exemptions out of the partnership property.

7. SAME—SELECTION.

Where bankrupts failed to make their selection of specific articles for their exemptions at the time of the filing of their schedules, and to have the property set off to them by the trustee, to be reported by him, with their estimated value, to the court, for its approval, as required by Bankr. Act July 1, 1898, c. 541, § 7a (8), 30 Stat. 548 [U. S. Comp. St. 1901, p. 3425], and section 47a (11), 30 Stat. 557 [U. S. Comp. St. 1901, p. 3439], the trustee had no authority to pay the exemption to the bankrupts in cash out of the proceeds of a sale of bankrupt property, although unanimously assented to by certain creditors present at a meeting before the referee.

8. SAME—TAX COLLECTORS—ESTOPPEL.

Where claims for taxes had been filed against a bankrupt's estate, the tax collectors had no power to prejudice the municipalities which they represented by agreeing that the bankrupt's exemptions might be paid to them, and hence they were not estopped from subsequently repudiating such agreement.

9. SAME—OPERATION OF BUSINESS BY TRUSTEE—DEFICIT.

Where a bankrupt's hotel was operated during the pendency of bankruptcy proceedings, first under the direction of the court, through a receiver, and afterwards by the creditors through the bankrupt's trustee, a deficit made up of premiums paid for insurance on personal property and on the hotel, together with an amount paid for a liquor license necessary to maintain the good will and custom of the hotel, and the cost of advertising the sale of the property, constituted a preferred claim on the proceeds of the sale.

¶ 2. See Taxation, vol. 45, Cent. Dig. § 946.

10. Same—Costs.

Where a sale of a bankrupt's real estate was made subject only to a first mortgage thereon, the proceeds of the sale should be applied to the satisfaction of other liens on such real estate, undiminished by anything except the costs of the sale, etc., to the exclusion of the costs of administering the bankrupt's estate.

In Bankruptcy. On certificate of W. G. Thomas, referee.

James S. Biery and J. C. Loose, for exceptions.
W. G. Freyman and E. O. Nothstein, opposed.

ARCHBALD, District Judge. The trustee realized $1,150 from the sale of the bankrupts' personal property, and $1,450 from the real estate, and the question is how the money should be distributed. The principal controversy arises over the taxes. At the time the proceedings in bankruptcy were instituted, in August, 1901, the bankrupts were owing county, school, poor, and borough taxes to the extent of $478.50, which, with penalties for nonpayment subsequently accruing, ran the amount up to $502.43. While the estate was in the hands of the trustee, it was further assessed the same amount for like taxes for the year 1902, and claim is now made for both years. It is clear that, so far as the real estate fund is concerned, these taxes are not entitled to payment. The sale of the real estate was made subject to a first mortgage of $18,000, and the amount obtained, $1,450, is claimed by Mr. Nothstein, who holds a second mortgage of $12,500. It is expressly provided by section 67d of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 564 [U. S. Comp. St. 1901, p. 3451]) that:

"Liens given or accepted in good faith and not in contemplation of or in fraud upon this act, and for a present consideration, which have been recorded according to law, if record thereof was necessary in order to impart notice, shall not be affected by this act."

This requires that the money realized from the sale of property on which there are existing liens shall go to satisfy them according to their priority. There can be no question that the Nothstein mortgage was divested by the sale, and thereby remitted to the fund for payment. Not only is this implied by the order of the court, by which the sale was directed to be made subject to the first mortgage, but it was expressly provided in the original order of the referee, of which the subsequent order of court was a mere continuance, that this should be the case; and, in view of this, Mr. Nothstein, being the trustee, obtained special leave to bid as a lien creditor. The return of sale, also, is in line with this. It would not only fly in the face of the record, therefore, but would be contrary to what was the confessed understanding of all parties, to hold that the lien of this mortgage still remains.

But payment of the taxes out of the proceeds of the sale is sought to be maintained by virtue of the Pennsylvania act of Assembly of June 4, 1901 (P. L. 364), by section 2 of which it is provided that all taxes which may thereafter be lawfully imposed or assessed on any property shall be a first lien thereon, together with all charges, expenses, and fees for failure to pay promptly, and that "such lien shall have priority to, and be fully paid and satisfied out of the proceeds of, any judicial sale of said property, before any other obligation, judgment,

claim, lien, or estate with which the said property may become charged or for which it may become liable, save and except only the costs of the sale and of the writ upon which it is made."

It is to be noted that, if this act covers the taxes of 1901, it does those of 1902 also—assuming that the property is liable for the latter in the hands of the trustee—since both were assessed before the sale. But the truth is that it applies to neither. The act, by its terms, is prospective, and not retroactive; priority being given to taxes only as against any obligation, judgment lien, etc., with which the property "may become charged, or for which it may become liable." This plainly refers to the future. Lukens v. Katz, 12 Pa. Dist. R. 604. And the Nothstein mortgage, having been executed and recorded in December, 1900, six months before the act was passed, is not, therefore, affected by it. Whether it would be competent for the Legislature to postpone in favor of taxes a lien already duly acquired, it is not necessary to decide, for they have not undertaken to do so; nor, if the construction of the act was doubtful, would this be presumed.

But it is urged that by the thirty-second section (page 375) of the act the taxes are made a continuing lien on the property, notwithstanding a sale, unless the proceeds are sufficient to pay them, and that they should not fare any differently or better in the bankruptcy court than they would elsewhere, and should therefore be left to be worked out against the property in the hands of the purchaser; the municipalities to which they are due being abundantly secured thereby. In re Veitch, 4 Am. Bankr. Rep. 112, 101 Fed. 251. In re Brinker (D. C.) 128 Fed. 634; City of Waco v. Bryan (C. C. A.) 127 Fed. 79 (dissenting opinion of Shelby, J.). But it is not correct to assume that the lien of the taxes continues notwithstanding the sale which has been made. No doubt they would if the matter was regulated purely by the state law. But notwithstanding what has been said above about liens being unaffected by bankruptcy proceedings, it is in the power of the court to order a sale free and clear of them, regardless of how they would ordinarily stand. In re Keet, 11 Am. Bankr. Rep. 117, 128 Fed. 651. And the court having undertaken to administer upon the real estate in the present instance, and directed a sale subject to the lien of the first mortgage, all others were thereby divested; and any one who purchased upon the faith of this, as disclosed by the record, took a clear title, on which nothing further can be imposed.

But if nothing can be made for the taxes in question out of the real estate, it is clear that, so far as the personal fund is concerned, the taxes of 1901, at least, are entitled to be paid. The order of priority in which debts or charges against the estate of a bankrupt are to be met is established by section 64 of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 563 [U. S. Comp. St. 1901, p. 3448]), by subsection "a" of which it is provided that "the court shall order the trustee to pay all taxes legally due and owing by the bankrupt to the United States, state, county, district, or municipality in advance of the payment of dividends to creditors, and upon filing the receipts of the proper public officers for such payment he shall be credited with the amount thereof"; and by subsection "b" that the order of payment, except as so provided, shall be (1) the actual and necessary cost of preserving the estate subsequent

to filing the petition; (2) the filing fees paid in involuntary cases, and the reasonable expenses of creditors in recovering property transferred or concealed by the bankrupt; (3) the costs of administration; (4) wages due to workmen, clerks, or servants, earned within three months; and (5) debts owing to any person entitled by the laws of the states or the United States to priority. Taxes, as a class, are thus put at the head of everything—even above the expense of preserving the estate, or the cost of administering it. Brandenburg, § 1008; Collier (4th Ed.) 459. This is explicit and decisive, and, as the taxes of 1901 are unquestionably within the provisions of the act, they must be paid.

The taxes for 1902 stand somewhat differently. They were not due and owing by the bankrupts at the time of their bankruptcy, but have accrued since the proceedings were instituted, and do not, therefore, fall within the strict letter of the law. But the bankruptcy act does not withdraw the estates of bankrupts from the reach of the taxing powers, and they are subject, in consequence, to the payment of taxes imposed while they are in the hands of trustees, the same as if they were not. Swarts v. Hammer, 120 Fed. 256, 56 C. C. A. 92, affirmed 194 U. S. 441, 24 Sup. Ct. 695, 48 L. Ed. 1060; City of Waco v. Bryan (C. C. A.) 127 Fed. 79; In re Sims (D. C.) 118 Fed. 356; In re Conhaim, 4 Am. Bankr. Rep. 59, 100 Fed. 268; In re Keller, 6 Am. Bankr. Rep. 356, 109 Fed. 131. Even though accruing after bankruptcy, they must be regarded as within the meaning of the statute, and entitled to priority, the same as those which antedated it. They are equally important to the municipalities to which they are due, whenever assessed, and the obligation of the property to respond is logically no different or greater at the one time than at the other. The same reasons existing in both cases, it must be assumed that no distinction was intended to be made between them. The taxes of 1902 must consequently be paid, the same as those of 1901, out of the personal fund, in preference to every other charge; and this includes the penalties for nonpayment, which are a constituent part of them. City of Titusville's Appeal, 108 Pa. 600; 27 Am. & Eng. Enc. Law (2d Ed.) 778. The taxes of 1901 were duly and promptly proved within the year, but it is no objection to those of 1902 that they were not. Indeed, where taxes do not accrue until after the adjudication, it might not be possible in many cases to conform to this requirement. Moreover, they are matters of public record, of which every one is bound to take notice. In re Harvey, 10 Am. Bankr. Rep. 567, 122 Fed. 745. And the bankruptcy act evidently does not contemplate that they shall be proved like an ordinary debt; providing, as it does, that they shall be paid by the trustee on the order of the court, and that he shall have credit in his accounts upon filing the receipts of the proper officers therefor.

The taxes for the two years in question together amount to $1,004.85, and, as the personal property fund is only $1,150, there is but $145.15 left to meet other demands. This cuts out a large number of items which appear in the trustee's accounts, prominent among which is $300 paid in cash to the bankrupts as their state exemption. But there was unfortunately no authority for this payment, so far, at least, as any one now before the court is concerned, and it is difficult to see how the trustee was led into making it. As partners, the bankrupts had no right

to an exemption out of partnership property. Bonsall v. Comly, 44 Pa. 442; Clegg v. Houston, 1 Phila. 352. And even if this were not so, they were bound to designate specific articles, and were not entitled to come in on the proceeds after they had been sold. Hammer v. Freese, 19 Pa. 255. Moreover, it was their duty to make this designation at the time of filing their schedules, and to have the property set off to them by the trustee, who was required to report the items, with their estimated value, to the court for its approval. Bankr. Act, § 7a (8); Id. § 47a (11); In re Duffy, 9 Am. Bankr. Rep. 358, 118 Fed. 926; In re Le Vay, 11 Am. Bankr. Rep. 114, 125 Fed. 990. The assent of creditors, who are said to have unanimously agreed at one of the meetings before the referee that the bankrupts should receive their exemption in cash, could not dispense with these formalities, or give the bankrupts that to which they were not legally entitled. In re Grimes, 2 Am. Bankr. Rep. 730, 96 Fed. 529. And however much those who joined in this reported action may be estopped from repudiating it after the trustee has paid the money, nothing of that kind can be set up against the parties who are claiming here. Both are tax collectors, and neither could prejudice in any such way the municipalities which they represent. It is of no consequence, therefore, whether Culver, who has the taxes for 1901, was present at the meeting referred to; and Sitler, who has those for 1902, could not have been, for they were not then in his hands.

The other items which are displaced cover the deficiency resulting from the trustee's running the hotel, the filing fees, and the costs of administration, including the referee's fees and the expenses of making the sale. The bankrupts at the time the proceedings were instituted were engaged in the hotel business, and, in order to preserve the good will, for the benefit of all parties interested, until the property was brought to a sale, Mr. Nothstein was directed to carry on the business, first by the court, as receiver, and afterwards by the creditors, as trustee. This he did for some 15 months; making an attempt meanwhile to sell the property, which was ineffectual because of depressing local conditions. But the result was a deficit of $708.65, and the question is how it is to be disposed of. This deficit is made up of $125 paid to insure the personal property, $375 for insurance on the hotel, and $200 for a liquor license; the remaining $8.65 being odds and ends. The first of these falls naturally upon the personal fund, and the other three upon that derived from the realty. The disposition of the insurance is sufficiently obvious, but, with regard to the license, it is proper to say that until the hotel was sold it was important to maintain its good will or custom, and to this the license was essential. The delay in effecting a sale having necessitated these expenditures, they are to be paid out of the proceeds of the real estate in preference to liens which were benefited by them, on the same principle as the expenses of a managing receivership. So, also, are the costs of advertising, amounting to $50.75. Some of this, perhaps, may have been for the benefit of the personal property, but there is no way of separating it.

But what is to be done with the large amount of costs incurred in administering the estate, which still remains? The $20.15 which is left of the personal fund will take care, to that extent, of the filing fees,

which by the bankruptcy act are put next in order of preference. But in addition to the remnant of these fees, of $4.85, there are clerk's costs, of $15.41; the referee's bill, of $229.50; the appraisers' fees, of $93; $17.50 due the stenographer; and $1.50 of sundries. If the real estate fund could be appropriated, regardless of the displacement of liens, there would be no difficulty, and it is held by some that it can be. Brandenburg, §§ 1009, 1010; In re Tebo (D. C.) 101 Fed. 419. But the better opinion is otherwise. Collier (4th Ed.) 458; Stewart v. Platt, 101 U. S. 731, 25 L. Ed. 816. It is expressly provided by the act, as we have seen, that liens which do not infringe upon its terms shall not be affected, and this is not observed if the security on which they depend is liable to be eaten into by the general costs of the proceedings. A sale of the property free of liens may undoubtedly be ordered, but, if this is done, the proceeds must be applied to their satisfaction, undiminished by anything except the costs of sale, or the expenses, if any, which have been undertaken for, and result to, their benefit. They are not concerned with the bankruptcy proceedings outside of this, and cannot, therefore, be charged with the cost of instituting them or carrying them on. Whether in such a case—there being no other way of providing for the costs—they may be put on the petitioning creditors, is a question I shall not attempt to decide. There is a possible lapse in the law as it stands, which ought to be provided for.

The exceptions are sustained, and the case is sent back to the referee with instructions to distribute the estate in the hands of the trustee in conformity with the views expressed in this opinion.