ADAIR *v.* BANK OF AMERICA NATIONAL TRUST
& SAVINGS ASSN.

No. 365.   Argued February 2, 1938.—Decided February 28, 1938.

*Mr. William Lemke*, with whom *Mr. Harold M. Sawyer* was on the brief, for petitioner.

*Mr. Hugo A. Steinmeyer*, with whom *Mr. William C. Day* was on the brief, for respondent.

MR. JUSTICE REED delivered the opinion of the Court.

This writ was asked to review a decree of the Circuit Court of Appeals for the Ninth Circuit, upholding the objections and exceptions of the respondent, a creditor, to the final account of petitioner, a conciliation commissioner appointed under § 75 (a) of the Bankruptcy Act, and reversing the order of the District Court which had settled and allowed the account. The Circuit Court of Appeals held that the petitioner should have been required to pay to respondent the gross proceeds of the grape crop harvested on the debtor's land after the debtor had filed his petition under § 75 of the Bankruptcy Act, without any deduction for moneys spent in harvesting that crop and for other purposes, because of the fact that the crop was subject to a chattel mortgage held by respondent. 90 F. (2d) 750. In view of the importance of the question with respect to proceedings instituted under § 75 of the Bankruptcy Act, this Court granted certiorari.

On August 6, 1934, Andrea Cuccia, a farmer, filed an adequate petition under § 75 (a) to (r) of the Bankruptcy Act, showing by the schedules secured claims to respondent of over $12,000 and unsecured claims of a

slightly larger amount, and expressing his desire to effect a composition or extension of time to pay his debts. His petition was referred to Noah Adair, the Conciliation Commissioner for the County of San Bernardino, California. On January 7, 1935, an amended petition was filed by the debtor, stating that he had failed to obtain the approval of his creditors to a composition or extension proposal and praying that he might be adjudged a bankrupt under the provisions of § 75, subsection (s) of the Bankruptcy Act, as enacted June 28, 1934. Adjudication was entered and the proceedings referred to the Referee in Bankruptcy. On October 14, 1935, the District Court, on a motion by the respondent, dismissed the petition. On March 16, 1936, the debtor attempted to invoke the benefits of the amended § 75 (s), but we are not here concerned with that petition and the subsequent proceedings (set out in *Bank of America National Trust & S. Assn.* v. *Cuccia,* 93 F. (2d) 754, decided December 30, 1937, on rehearing, by the Circuit Court of Appeals for the Ninth Circuit).

The respondent, at the beginning of and throughout the proceedings, held a matured note of the debtor and his wife, secured by a deed of trust on certain lands in the County of San Bernardino, California, and by a mortgage on the crops growing or to be grown on the same lands, during 1933 and 1934, or prior to the payment in full of the total indebtedness. The crop mortgage required the mortgagor to cultivate, harvest and deliver the crop to the mortgagee, without cost to the mortgagee, for sale and application of the proceeds to the debt.

The present controversy had its origin in the respondent's petition to the Court, on February 6, 1936, for an accounting by the conciliation commissioner of funds realized from crops sold off the debtor's premises in 1934. In response to the order of the District Court, the conciliation commissioner made an accounting as appears in

the footnote.[1]  The Bank objected to the account on the ground that the money was the proceeds of the sale

[1] Account—Filed February 17, 1936:

| | |
|---|---:|
| September 26, 1934—An account in the name of Andrea Cuccia and Noah Adair was opened with the American National Bank, San Bernardino, California, and a deposit of $1,437.37 was made........................ | $1,437.37 |
| September 26, 1934—Cash, labor, for 20 men on ranch. Court Order issued *.............................. | 340.00 |
| October 1, 1934—Andrea Cuccia...................... | 59.33 |
| October 30, 1934—Andrea Cuccia, 14 days labor Court order issued...................................... | 42.00 |
| November 27, 1934—Andrew Cuccia, $15. living expense $20. filing fee under 75(s) and $20. feed for horse. Court order...................................... | 55.00 |
| December 20, 1934—Andrea Cuccia, $10. feed for horse and $10. living expense............................ | 20.00 |
| January 22, 1935—Andrea Cuccia, $20. and labor on grove $144.00...................................... | 164.00 |
| [fol. 18] January 22, 1935—D. W. Richards indemnity fee under Section 75(s)............................ | 18.25 |
| February 1, 1935—Andrea Cuccia, labor, 8 men, 11 days each......................................... | 264.00 |
| February 15, 1935—Andrea Cuccia labor.............. | 90.00 |
| March 15, 1935—Andrea Cuccia, $45. labor; $20. hay and $10. living expense................................ | 75.00 |
| April 19, 1935—Jos. E. Rich, Court Reporter........... | 22.50 |
| April 19, 1935—Ralph W. Eckhardt, attorneys fee....... | 50.00 |
| April 19, 1935—Andrea Cuccia, 37 days work of hired men. | 111.00 |
| May 11, 1935—Andrea Cuccia, sulphur for grapes....... | 60.00 |
| June 1, 1935—Andrea Cuccia, labor for two men working in grapes......................................... | 30.00 |
| Total........................................ | $1,401.08 |
| Tax, etc........................................... | .60 |
| | $1,401.68 |

Balance in bank to date, $35.69.

* [The "court order" refers to an order entered by petitioner himself.  The only order entered by the District Court as to these expenditures was its order of approval of the account filed by petitioner.]

of a crop covered by the chattel mortgage above referred to and that the disbursements from the fund were made without valid order by the District Court and without the Bank's notice or knowledge of any court order. It was further objected that after adjudication in bankruptcy under § 75 (s) the conciliation commissioner had no jurisdiction. Petitioner stated in his answer and testimony that the items appearing prior to the adjudication in bankruptcy of January 7, 1935, were disbursed, on his orders as conciliation commissioner, either to gather the 1934 crop or to provide for care of the property, and that the items appearing from January 22 through June 1, 1935, were disbursed under the direction of the referee in bankruptcy. The District Court, finding that the expenditures of the conciliation commissioner were made in good faith and for the purpose of conserving the estate, settled and allowed the account. The Circuit Court of Appeals directed the disallowance of the account and the payment by the conciliation commissioner to the respondent of the gross proceeds of the mortgaged crop.

*First.* The powers granted by the bankruptcy clause of the Constitution, Article 1, § 8, cl. 4, are not limited to the bankruptcy law and practice in force in England or the States at the time of its adoption. *Continental Illinois Nat. Bank & T. Co.* v. *Chicago, R. I. & P. Ry. Co.,* 294 U. S. 648, 668. Then the interests of the creditor alone were protected. Progressive liberalization of bankruptcy and insolvency laws, in an effort to avert the evils of liquidation, has furnished opportunity for composition in bankruptcy proceedings and later for composition and extension of debts in relief proceedings for individual debtors, for reorganization of railroads and other corporations, and for public debtor proceedings.[2]

[2] Bankruptcy Act of 1867, as amended by the Act of 1874, c. 390, § 17, 18 Stat. 178, 182; Act of March 3, 1933, c. 204, 47 Stat. 1467; Act of June 7, 1934, c. 424, 48 Stat. 911; Act of June 28, 1934, c.

Section 75 of the Bankruptcy Act[3] provides similar opportunities for the rehabilitation of farmers. *Wright* v. *Vinton Branch Bank,* 300 U. S. 440, 456. It is sought to accomplish this rehabilitation through composition or extension of debts, subsections (e) to (l). On failure of composition and extension, further opportunity for rehabilitation is afforded the debtor, through provisions enabling him to retain possession of his property, under conditions favorable to its ultimate redemption by him. These steps are carried out under judicial supervision, subsection (s).[4]

To accomplish its purpose, § 75 provides that the filing of a petition shall effect a stay.[5] Such a stay under

869, 48 Stat. 1289; Act of April 10, 1936, c. 186, 49 Stat. 1198; Act of April 11, 1936, c. 210, 49 Stat. 1203, Act of August 16, 1937, c. 657, 50 Stat. 653.

[3] Subsections (a) to (r) were added by the Act of March 3, 1933, c. 204, § 1, 47 Stat. 1470–1473, and subsections (a) and (b) amended by the Act of June 7, 1934, c. 424, §§ 8 and 9, 48 Stat. 911, 925. Subsection (s), the first Frazier-Lemke Act, was added June 28, 1934, c. 869, 48 Stat. 1289. Subsequent to the decision in *Louisville Joint Stock Land Bank* v. *Radford,* 295 U. S. 555, various subsections, including (s), were amended by the new Frazier-Lemke Act, August 28, 1935, c. 792, 49 Stat. 942.

[4] Subsection (s) in effect at the institution of this proceeding for the relief of a debtor was held unconstitutional in *Louisville Joint Stock Land Bank* v. *Radford,* 295 U. S. 555. The new subsection (s) was approved in *Wright* v. *Vinton Branch,* 300 U. S. 440.

[5] Subsection (o) of § 75 (which has never been amended) provides:

"(o) Except upon petition made to and granted by the judge after hearing and report by the conciliation commissioner, the following proceedings shall not be instituted, or if instituted at any time prior to the filing of a petition under this section, shall not be maintained, in any court or otherwise, against the farmer or his property, at any time after the filing of the petition under this section, and prior to the confirmation or other disposition of the composition or extension proposal by the court:

"(1) Proceedings for any demand, debt, or account, including any money demand;

356

judicial discretion as to enforcement of claims does not take property without due process and is constitutional. *Continental Illinois Nat. Bank & T. Co.* v. *Chicago, R. I. & P. Ry. Co., supra,* at pages 675 *et seq.* and 680 *et seq.; Wright* v. *Vinton Branch, supra,* 460; *Home Bldg. & Loan Assn.* v. *Blaisdell,* 290 U. S. 398. In order to operate and protect the property during the stay, and pending confirmation or other disposition of the composition or extension proposal, the statute provides in subsections (e) and (n)[6] for the exercise by the court of "such control

"(2) Proceedings for foreclosure of a mortgage on land, or for cancellation, rescission, or specific performance of an agreement for sale of land or for recovery of possession of land;

"(3) Proceedings to acquire title to land by virtue of any tax sale;

"(4) Proceedings by way of execution, of attachment, or garnishment;

"(5) Proceedings to sell land under or in satisfaction of any judgment or mechanic's lien; and

"(6) Seizure, distress, sale, or other proceedings under an execution or under any lease, lien, chattel mortgage, conditional sale agreement, crop payment agreement, or mortgage."

[6] These subsections, as originally enacted, read:

"(e) . . . After the filing of the petition and prior to the confirmation or other disposition of the composition or extension proposal by the court, the court shall exercise such control over the property of the farmer as the court deems in the best interests of the farmer and his creditors."

"(n) The filing of a petition pleading for relief under this section shall subject the farmer and his property, wherever located, to the exclusive jurisdiction of the court. In proceedings under this section, except as otherwise provided herein, the jurisdiction and powers of the court, the title, powers, and duties of its officers, the duties of the farmer, and the rights and liabilities of creditors, and of all persons with respect to the property of the farmer and the jurisdiction of the appellate courts, shall be the same as if a voluntary petition for adjudication had been filed and a decree of adjudication had been entered on the day when the farmer's petition or answer was filed."

Subsection (e) has never been amended. Subsection (n) was amended in respects not material here, by the Act of August 28, 1935, c. 792, 49 Stat. 942.

over the property of the farmer as the court deems in the best interests of the farmer and his creditors." These provisions look toward the maintenance of the farm as a going concern, and afford clear authority, in a proper case, for the continuance of the operations of the farm after the filing of a petition under § 75 of the Bankruptcy Act.

*Second.* In holding the conciliation commissioner personally liable, we think the lower court misconceived the nature of his office. At the time of filing the original petition for composition and extension, August 6, 1934, § 75 of the Bankruptcy Act was comprised of subsections (a) to (s) inclusive. Subsections (a) to (r) made provision for conciliation commissioners, set up the same qualifications for eligibility to this office as are required for the office of referee, authorized the conciliation commissioners to receive and transmit the petitions and schedules, to call the first meeting of creditors, with notice of terms of composition or extension, to hear the parties in interest, to prepare final inventory, to supervise the farmer's affairs during an extension period and to distribute the consideration after a composition. In accordance with § 75, subsection (b), this Court, as of April 24, 1933, established Rule L, governing proceedings under § 75, (a) to (r) inclusive, as an addition to the General Orders in Bankruptcy, 288 U. S. at 641. Rule L provided for reference to the conciliation commissioner, and his carrying out of the duties outlined above. The commissioner was given, in so far as consistent with § 75 and Rule L, "all the powers and duties of a referee in bankruptcy," to be carried out under the General Orders in Bankruptcy. Rule L (11). Sections 38 and 39 of the Bankruptcy Act and subsections 3 and 6 of Rule L indicate the wide extent of the authority of the conciliation commissioner. Under § 38, Bankruptcy Act, clause four, the referee is empowered to "perform such part of the

duties, except as to questions arising out of the applications of bankrupts for compositions or discharges, as are by this Act conferred on courts of bankruptcy . . ." [7]

In view of the foregoing the conciliation commissioner had the authority, prior to the adjudication of bankruptcy under § 75 (s), to act as the "court," in the first instance and subject to review, in controlling the property of the debtor "in the best interests of the farmer and his creditors." § 75 (e). *In re Wiedmer,* 82 F. (2d) 566. Under this authority the conciliation commissioner acted in authorizing the expenditures shown on the account for gathering the crop of 1934, preparing for the crop of 1935, and paying fees and expenses. It is plain that the conciliation commissioner, like the referee (*White* v. *Schloerb,* 178 U. S. 542, 546; *Mueller* v. *Nugent,* 184 U. S. 1, 13) exercises some of the "judicial authority" of the bankruptcy court. The acts just detailed were judicial acts. Error within his jurisdiction does not subject him to personal liability. *Randall* v. *Brigham,* 7 Wall. 523, 535. See also *Bradley* v. *Fisher,* 13 Wall. 335; *Alzua* v. *Johnson,* 231 U. S. 106; *Yaselli* v. *Goff,* 275 U. S. 503. Cf. *First National Bank* v. *Bonner,* 74 F. (2d) 139, 142; *United States* v. *Ward,* 257 Fed. 372,

---

[7] "Applications of bankrupts for compositions," as used in this clause, does not refer to proceedings of debtor for rehabilitation under § 75. And even under § 12, the referee has authority to proceed with steps preliminary to the application for confirmation of the composition proposal. Cf. General Order XII, paragraph 3; *In re Bloodworth-Stembridge Co.,* 178 Fed. 372.

Rule 77 of the District Court for the Southern District of California reads as follows: "Rule 77.—Jurisdiction of Referees. It is ordered that the Referees in Bankruptcy of said Court be, and they are hereby vested with jurisdiction in all bankruptcy cases within the limits of their respective counties, to perform all the duties conferred on Courts of Bankruptcy, which Referees may be required or authorized to perform; except as otherwise provided by General Order in Bankruptcy No. XII."

377. This doctrine is quite clear when, as here, no rule or positive enactment was violated and the acts were bona fide.

The fact that the proceeds of the crop were banked to the joint account of the debtor and the conciliation commissioner may have obscured the judicial character of the latter. Better practice would suggest that the account appear in the name of the debtor, with the counter-signature of the conciliation commissioner required for withdrawals. Also, at an early, preferably the first, meeting of creditors, the method of handling the business of the debtor pending confirmation or further order should have been developed and proper orders entered. Cf. § 12 (a), Bankruptcy Act. This does not appear to have been done. These irregularities do not suffice to withdraw from the conciliation commissioner his judicial protection. *Alzua* v. *Johnson,* 231 U. S. 106.

Some disbursements were made after the adjudication in bankruptcy under subsection (s) and the reference of the proceedings to a referee in bankruptcy. It is unnecessary to decide whether, under § 75 (s) as originally enacted, the conciliation commissioner could have continued to act as referee. In this case, there was no further reference of the proceedings to petitioner, and he continued to act solely at the direction of the referee in bankruptcy. His uncontradicted testimony was as follows:

"When this matter was referred to D. W. Richards as referee I wanted him to take the money I had on hand and become the custodian of it. He asked me to keep the money and said he would trust me in the expenditure of the money while it was under him and that he would O. K. the checks, so all the checks that were written after it went to D. W. Richards were O. K.'d by him and I wrote the checks at his request."

Without determining the effect of the unconstitutionality of subsection (s) upon the steps taken under its

authority, it appears that the petitioner acted either judicially, continuing to exercise his powers as conciliation commissioner, or ministerially, as an arm of the court, under the direction and with the approval of the referee. Under the facts of this case we do not think petitioner is personally liable for these disbursements. Cf. *First National Bank* v. *Bonner,* 74 F. (2d) 139, 142.

*Third.* Moreover, the expenditures assailed by respondent were proper, at least with respect to the principal items (which are the only ones we shall consider)—the amounts spent in harvesting the 1934 crop, which was sold in order to create the fund, and the amounts spent for preservation of the vineyard and for the cultivation of the 1935 crop. There is no showing that petitioner was improvident. Reference is made in his account to money paid to the farmer as "living expenses," but the record discloses that the amounts paid the debtor did not exceed the ordinary wages for the work he actually and necessarily performed in the maintenance of the vineyard. Compare *Wright* v. *Vinton Branch, supra,* 300 U. S. at 466; *In re Barrow,* 98 Fed. 582.

The court below ruled that under the crop mortgage the farmer had the obligation to cultivate and harvest the crop at his own expense, and therefore the gross proceeds belonged to respondent. This conclusion disregards the fact that the debtor did not harvest the grapes as an ordinary mortgagor. He had come into court seeking relief under § 75 of the Bankruptcy Act. The filing of his petition put the property in the control of the court and the harvesting of the crop and the preservation of the property became a matter for the concern and action of the court.

Respondent certainly cannot complain of the devotion of the proceeds of the 1934 crop to the cost of harvesting that crop. The care and harvesting of that crop represented the only way to preserve its worth (cf. *Union*

*Trust Co.* v. *Illinois Midland Ry. Co.,* 117 U. S. 434, 455), and the cost of protecting a fund in court is everywhere recognized as a dominant charge on that fund. See *Bronson* v. *La Crosse R. Co.,* 1 Wall. 405, 410; *Shepherd* v. *Pepper,* 133 U. S. 626, 652; *Thompson* v. *Phenix Ins. Co.,* 136 U. S. 287, 293; *Atlantic Trust Co.* v. *Chapman,* 208 U. S. 360, 376; *Wright* v. *Vinton Branch, supra,* 300 U. S. at 468. The rule applies even in ordinary bankruptcy proceedings [8] since the secured creditor benefits from the disbursement.[9]

And since the creditor in this case had a lien on the crop for future years and on the real estate, we cannot say that the money expended for maintenance of the real estate and toward production of the 1935 crop was not likewise for its benefit. Compare *Wright* v. *Vinton Branch, supra,* 300 U. S. at 468.[10] Respondent itself has

[8] Though the court orders a sale free of liens without the consent of the lienholder, the cost of preserving the property is deducted before the proceeds are turned over to him. *C. B. Norton Jewelry Co.* v. *Hinds,* 245 Fed. 341, 343; *In re N. Y. & Phila. Package Co.,* 225 Fed. 219, 224; *In re Hansen & Birch,* 292 Fed. 898, 899; *In re Westmoreland,* 4 F. (2d) 602, 603; *In re Prince & Walker,* 131 Fed. 546, 551; *In re Davis,* 155 Fed. 671, 673.

[9] See *Virginia Securities Corp.* v. *Patrick Orchards,* 20 F. (2d) 78, 81; *C. B. Norton Jewelry Co.* v. *Hinds,* 245 Fed. 341, 343; *In re Prince & Walker,* 131 Fed. 541, 546.

[10] The Court said:

"(c) The disposition of the rental required to be made is said to involve denial of the mortgagee's rights. Paragraph 2 provides:

"'Such rental shall be paid into court, to be used, first, for payment of taxes and upkeep of the property, and the remainder to be distributed among the secured and unsecured creditors, and applied on their claims, as their interests may appear.'

"It is suggested that payment of taxes and keeping the property in repair takes the income from the mortgagee, and that the mortgagor alone may be benefited thereby; that if the mortgagor exercises the option to purchase the property at its appraised value, he will secure the property free of tax liens which otherwise might have accrued against it. But it must be assumed that the mortgagor

suggested, in another connection (see *Bank of America National Trust & S. Assn.* v. *Cuccia, supra*), that the grape vines require "cultivation, pruning and care," lest they "deteriorate." It is unnecessary to determine the effect of an expenditure of the proceeds of a crop where the mortgagee has no lien on the property preserved and protected by the expenditures.

The decree is reversed and the cause remanded for further proceedings in conformity with this opinion.

*Reversed.*

MR. JUSTICE MCREYNOLDS concurs in the result.

MR. JUSTICE CARDOZO took no part in the consideration or decision of this case.

---

will not get the property for less than its actual value. The Act provides that upon the creditor's request the property must be reappraised, or sold at public auction; and the mortgagee may by bidding at such sale fully protect his interest. Non-payment of taxes may imperil the title. Payments for upkeep are essential to the preservation of the property. These payments prescribed by the Act are in accordance with the common practice in foreclosure proceedings where the property is in the hands of receivers."