In re CHICAGO, M., ST. P. & P. R. CO.

ABRAMS et al. v. SCANDRETT et al.

Nos. 7529–7537.

Circuit Court of Appeals, Seventh Circuit.

May 20, 1941.

Rehearing Denied June 23, 1941.

Meyer Abrams, of Chicago, Ill., F. C. Nicodemus, Jr., and A. Perry Osborn, both of New York City, and Henry Gardner and Helen W. Munsert, both of Chicago, Ill., for appellants.

Fred N. Oliver, of New York City, Kenneth F. Burgess, Douglas F. Smith, and Geo. Ragland, Jr., all of Chicago, Ill., Edwin S. S. Sunderland, Thos. O'G. Fitzgibbon, and Geo. J. Miller, all of New York City, and Henry F. Tenney, Roger R. Leech, C. S. Jefferson, A. N. Whitlock, and M. L. Bluhm, all of Chicago, Ill., for appellees.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

The order before us was entered in a proceeding for the reorganization of the Chicago, Milwaukee, and St. Paul Railway Co., Debtor, which was in court pursuant to the authorization of Sec. 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. It made allowances for fees to various attorneys and firms of attorneys who had appeared and rendered legal services of value in the reorganization.

Appellants are a firm of attorneys who participated in said proceedings, representing certain bondholders. They were allowed nothing for their services. Feeling aggrieved they have appealed and here present questions which involve the construction and validity of a statute, and the relative powers of the I. C. C. and the U. S. District Court, under said Sec. 77(c) (12).[1]

---

[1] "Section 77(c) (12):

"*Within such maximum limits* as are fixed by the Commission, *the judge may make an allowance*, to be paid out of the debtor's estate, for the actual and reasonable expenses (including reasonable attorney's fees) incurred in connection with the proceedings and plan by parties in interest and by reorganization managers and committees or other representatives of creditors and stockholders, and *within such limits may make an allowance to be paid out of the debtor's estate* for the actual and reasonable expenses incurred in connection with the proceedings and plan and reasonable compensation for services in connection therewith by trustees under indentures, depositaries and such assistants as the Commission with the approval of the judge may specially employ. *Appeals from orders of the court fixing such allowances* may be taken to the circuit court of appeals independently of other appeals in the proceeding and shall be heard summarily. The Commission shall, at such time or times as it may deem appropriate, after hearing, *fix the maximum allowances which may be allowed by the court* pursuant to the provisions of paragraph (12) of this subsection (c) and, after hearing if the Commission shall deem it necessary, *the maximum compensation which may be allowed by the court* pursuant to the provisions of paragraph (2) of this subsection (c)."

The facts, briefly sketched, are: Appellants represented bondholders who were permitted to intervene by both the District Court and the I. C. C. They rendered legal services throughout the proceedings in the District Court, and before the I. C. C. Their services covered a period of nearly five years, and they assert they gave advice and legal aid to the court in various ways—particularly in ascertaining the power of the court in matter of appointment of trustees, as well as various phases of the plan of reorganization submitted to and by the I. C. C. They were, so they say, ever ready to offer and did give aidful and valuable assistance in considering and modifying the plan of reorganization. Their testimony before the I. C. C., tended to corroborate the foregoing statement.

The I. C. C. required all parties having a claim for legal services and expenses rendered prior to April 15, 1940, to file them. Appellants presented their bill for $12,500 fees and $436.80 for expenses. They represented holders of $31,500 of convertible adjustment bonds which were a part of an issue of $182,873,693. These bonds had a value of less than twenty-five per cent of their par value.

Numerous claims were filed, and were disposed of in a single order. The sums fixed by the I. C. C. were the "final maximum limits of final allowances to be paid out of the estate of the debtor as reasonable compensation for all services rendered and as reimbursement for all actual and reasonable expenses incurred by the petitioner and claimants in connection with the proceedings and plan of reorganization of the debtor."

Paragraph (q) of that order affected appellants and read as follows:

"For services rendered and expenses incurred by Shulman, Shulman & Abrams, representing holders of the debtor's bonds, nothing."

Supplementing the order was a report of the Commission, wherein the work of the various claimants was set forth, and the character of the services rendered, described. Concerning the appellants, the following statement is taken from said report:

"Shulman, Shulman & Abrams represent holders of $31,500 of convertible adjustment-mortgage bonds and performed services and incurred expenses from July 18, 1935. They intervened in the proceeding before the court and the Commission, participated in hearings before the Commission on a plan of reorganization, filed exceptions to the report of the examiner of a plan, and filed a petition for modification of the Commission's plan. They participated in the court proceedings on the question of the appointment of trustees, examined notices, motions, and petitions, and appeared in court whenever necessary. They state that their efforts were primarily responsible for the abandonment of the first plan, and the abandonment of the proposal for a voting trust. We are not persuaded that the evidence supports such a statement. The firm submitted a statement showing the matters attended to on specific dates, but had no statement of time spent on the work. Its estimate of the time spent is 1,000 hours. We find that the services rendered were of no benefit to the estate."

Appellants filed a petition for rehearing before the I. C. C. They then filed objections in the District Court to the report and order of the I. C. C., and the following colloquy occurred between court and counsel:

"Mr. Abrams: I have filed objections to the report supported by a brief, and I would like to argue the objections orally.

"The Court: There is no need to argue the objections orally as I have read the objections and the brief and concluded that I have no jurisdiction to allow you any fees due to the report of the Commission.

"Mr. Abrams: Do I understand from Your Honor that your ruling is that no matter how much services I have performed and how valuable the services may be you are in no position to allow any compensation in view of the fact that the Commission's report in fixing the maximum allowances did not allow anything to my clients for their expenses and to our firm for its fees?

"The Court: You can read the Statute and that is my interpretation of the Statute and an order will be made overruling your objections to the report."

Appellants alone have appealed. We need only consider questions pertinent to their factual situation. They raise, however, numerous questions, to-wit: (a) The validity of Section 77(c) (12); (b) The power of the I. C. C., under Section 77(c) 12, to fix the maximum allowance for each attorney; (c) Was the Com-

mission's denial of all compensation to one firm of attorneys arbitrary and capricious? (d) Are the findings and determinations of the Commission, as to compensation of attorneys, reviewable by the District Court or this court?

■ We must construe Section 77(c) (12). Does it grant to the I. C. C. the power to fix the maximum for *each* counsel and even to set said maximum so low as to deny any compensation to individual claimants?

A study of the statute itself, and the history of the Congressional Records leading to its passage, compel us to answer the above question in the affirmative. When the legislation was before the House Judiciary Committee, in April, 1935, and Section 77(c) (12) was under consideration, the following took place:

"The Chairman. Under your power to fix the maximum you really could control it without this enumeration. *In other words, you need not fix any fee at all for those who you do not think are entitled to a fee.*

"Mr. Mahaffie: That, I think, probably is correct. In a statute of this kind, so far as the Congress cares to, however, it is helpful to an administrative body to have directions under which to proceed. It saves a lot of time.

"Mr. Celler. It is true, though, that the court has very little to do under those circumstances.

"Mr. Mahaffie. The court has to fix the actual fee and may have to hold a hearing on it.

"Mr. Hancock. You anticipate that the maximum fee fixed will be the fee allowed and will also be the minimum fee, do you not? In other words, there will be no discretion left to the judge at all, as a matter of fact.

"Mr. Mahaffie. I would not want to say that the court would not use some discretion under the statute. I anticipate that we will be the limiting factor on fees, however, if this proposed law is passed.

"Mr. Celler. For practical purposes there would be no discretion left in the court except as to your maximum which would be quite low, I imagine, considering all the facts.

"Mr. Mahaffie. I think that is substantially what has happened under section 77 as to the fixing of salaries; yes sir. We have fixed which we called a maximum

and I think the courts have almost uniformly paid it." (Page 70, Hearings before the Committee on the Judiciary, House of Representatives, 74th Congress, First Session on HR 6249.)

Also significant is the following taken from 79 Cong.Record, 13,307.

"A large percentage of the Committee felt that each class should pay their own attorneys' fees. The Chairman of the Committee shared in this view as an original proposition, but from my examination into the question and from the best technical advice we could get, the majority of the Committee became apprehensive that unless it was possible to pay some attorneys' fees from the estate, the small person in interest might not be represented, in view of the fact that they have not been able to make satisfactory progress under existing law with reference to reorganization, and *in view of the fact that the Railroad (Interstate Commerce) Commission would fix the total fees that could be allowed for reorganization* and the Courts are given further power to check this, the Committee was afraid to take the responsibility to eliminate these fees, taking the position that we should let it run along awhile and see what will happen."

Our reading of the statute convinces us that Congress contemplated a plan (which it enacted) whereby the I. C. C., not the District Court, should fix the maximum allowances to attorneys, and within that allowance the court was to exercise its judgment.

This section leaves little doubt in our mind for controversy. Congress made the duties of the District Court and the I. C. C. complementary. Avoidance of excessive fees and expenses was the object of this section. To accomplish the result thus sought, the I. C. C. was empowered (and required) to fix the ceiling,—the maximum of fees and expenses for the various counsel representing the numerous claimants. The court was ultimately to determine the amount of the fees, but its action was limited by the maximum fixed by the Commission.

There is some support for the contention that the I. C. C.'s power was limited to fixing the maximum allowance for *all* attorneys; leaving it to the District Court to determine the amount each individual lawyer should receive, but limiting the total of all allowances to the maximum

fixed by the I. C. C. Such a conclusion, however, runs counter to the use of plural nouns in the statute. To illustrate, we find in the first line the words "within such maximum limits." Again, in the last sentence, we find, "The Commission *shall * * after hearing, fix the maximum allowances which may be allowed by the court."*

If Congress had used the singular noun when speaking of allowances to counsel, it might still have been reconcilable with the power to fix the maximum allowance of each counsel. However, the use of the plural is not reconcilable with the fixation of an aggregate maximum amount.

There is much that might be said in favor of a policy which left the determination of the amount of compensation of each lawyer to the court, but within the aggregate fixed by the Commission for all fees and expenses. We are, however, construing, not writing a statute, the purpose and object of which was to avoid the allowance of excessive fees in railroad reorganization cases. Moreover, the main services in a railroad reorganization occur in the I. C. C. and not in the District Court. The I. C. C. therefore is in the better position to know which attorneys rendered the more valuable assistance and which rendered services of no value to the debtor.

*Constitutionality.* Little need be said on the constitutionality of this legislation dealing, as it does, with the subject of bankruptcy. More direct authority to Congress to act can hardly be found in the Constitution than that set forth in Article I, Section 8, Clause 4.[2]

The specific attack upon Section 77(c) (12) is directed to the failure to give the group, of whom claimants are a part, a right to a judicial review of the action and ruling of the administrative body. The second objection is the alleged unauthorized delegation of judicial power to the I. C. C. In other words, the I. C. C. is clothed with power to hear and determine compensation for services, which appellants assert is a judicial act.

There are several answers to these objections. In the first place, the power of Congress to deal with bankruptcy carries with it the right to select the tribunal, even going outside of courts, to administer debtors' estates. Second, appellants' claim arose after the bankruptcy or reorganization proceedings were instituted. Theirs was not a valid, existing claim at the time of bankruptcy. We have no hesitancy in holding that the Congress in enacting this railroad bankruptcy legislation could have provided that no attorneys' fees or expenses should be chargeable against the debtor's estate. There are no vested rights in favor of those who assist in administering a bankrupt estate, in and to fees for services. The allowance of such attorneys' fees is based upon the equitable rule that he who renders valuable services should be compensated therefor. But fees not specifically authorized are wholly within the power of the courts to deny. They are also subject to entire disallowance by act of Congress.

It follows, then, that if compensation for legal services in a bankruptcy proceeding (or in any equity proceeding, for that matter) is not a matter of right, but one of discretion, an act of Congress which makes provision for compensation by permitting an administrative board to determine the reasonableness and the value thereof, violates no constitutional right.

In other words, if the power to refuse all compensation exists, then it follows that Congress is within that same power when it provides for limited compensation and designates the tribunal which shall determine the amount thereof.

The difference between the position and rights of one who holds a valid obligation of the debtor, existing at the time of the bankruptcy, and one whose claim is traceable to services rendered after bankruptcy proceedings were begun, is clear and should be kept in mind. See Shulman, et al. v. Wilson-Sheridan Hotel Co., 301 U.S. 172, 57 S.Ct. 680, 81 L.Ed. 986; In re Central Shorewood Bldg. Corp., 7 Cir., 90 F.2d 725; In re Pine Block Bldg.

2 Warren v. Palmer, 310 U.S. 132, 60 S.Ct. 865, 84 L.Ed. 1118; Carpenter v. Wabash Ry. Co., 308 U.S. 539, 60 S.Ct. 102, 84 L.Ed. 454; Securities & Exchange Comm. v. United States Realty Co., 310 U.S. 434, 60 S.Ct. 1044, 84 L. Ed. 1293; Adair v. Bank of America, 303 U.S. 350, 58 S.Ct. 594, 82 L.Ed. 889; Wright v. Vinton Branch of Mountain Trust Bank, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736, 112 A.L.R. 1455; Wright v. Union Central Life Ins. Co., 304 U.S. 502, 58 S.Ct. 1025, 82 L.Ed. 1490.

Corp., 7 Cir., 90 F.2d 238; In re Deluxe Court Apt., 7 Cir., 86 F.2d 772; In re 1030 North Dearborn Corp., 7 Cir., 86 F.2d 775.

██ The charge that the Commission, in denying appellants any relief, acted arbitrarily and capriciously, must be rejected in view of the fact found by the Commission that appellants' services were of no value to the estate. The evidence upon which this finding was made was not before the District Court.

Unless the services were of value to the debtor's estate there was no justification for any allowance. [3]

The Commission did not find that no services were rendered; it found that they were of no value to the estate. If the services were of no value, it can not be said that the refusal of allowance to appellants was arbitrary or capricious.

Appellants point to the fact that some fifty-two other claimants filed claims for which compensation was allowed to all except three. Allowances were made as high as $79,000 and as low as $45. These allowances (and disallowances), however, do not establish merit in appellants' claim. They serve to show that the problem of allowance of fees presents difficulties, whether handled by the courts or an administrative body—and also that the degree of satisfaction (or dissatisfaction) is quite similar in either case.

In the last analysis, in a reorganization of a debtor so large as the C. M. & St. Paul Railroad, and with so many claimants with conflicting demands, all insistently presented, emphasis must be placed on the value of the services *to the debtor*.

Even if the evidence showed that the sum of $79,000 was excessive (which it does not), still it would not support appellants' claim that their services were of value to the estate.

In the face of the findings and conclusion of the Commission, which was within its authority, and which was backed by personal knowledge of the extent and value of services rendered, we are convinced that the District Court correctly held it was powerless to allow appellants any sum in this case.

The decree is affirmed.

[3] In re Irving-Austin Bldg. Corp., 7 Cir., 100 F.2d 574; In re Tower Bldg. Corp., 7 Cir., 88 F.2d 347; In re Central Shorewood Bldg. Corp., 7 Cir., 90 F.2d 725; In re Mayfair Bldg. Corp., 7 Cir., 97 F.2d 826; In re National Lock Co., 7 Cir., 82 F.2d 600; In re 211 E. Delaware Place Bldg. Corp., D.C., 13 F. Supp. 473; In re Hamburger, 7 Cir., 103 F.2d 664.