In re Douglas Ray PILLOW, Jr. and Suzette L. Pillow, Debtors.

Douglas Ray PILLOW, Jr., Plaintiff,

v.

AVCO FINANCIAL SERVICES, Defendant.

In re Thomas W. GEIGLE, Debtor.

Thomas W. GEIGLE, Plaintiff,

v.

AVCO FINANCIAL SERVICES, Defendant.

In re Max W. HORTON and Toni J. Horton, Debtors.

Max W. HORTON, Plaintiff,

v.

AVCO FINANCIAL SERVICES, Defendant.

In re Fred J. REVELLO and Florence O. Revello, Debtors.

Fred J. REVELLO and Florence O. Revello, Plaintiffs,

v.

AVCO FINANCIAL SERVICES, Defendant.

Bankruptcy Nos. 79–00177, 79–01272, 80–00188 and 80–00090.

Civil Proceeding Nos. 80–0059, 80–0061, 80–0060 and 80–0058.

United States Bankruptcy Court, D. Utah.

Jan. 8, 1981.

Richard Calder, Salt Lake City, Utah, for plaintiffs.

Edward Wells, Salt Lake City, Utah, for defendant.

Barbara Johnsen, Salt Lake City, Utah, for intervenor, United States of America.

## OPINION AND ORDER

RALPH R. MABEY, Bankruptcy Judge.

### INTRODUCTION

These cases are consolidated to determine whether the lien avoidance provisions of 11 U.S.C. Section 522(f)(2),[1] if applicable to security interests created before enactment of the Code,[2] are constitutionally infirm.

Debtors have filed complaints under Section 522(f) to avoid liens on personal property. Avco Financial Services (hereinafter called Avco) has moved, in essence, for dismissal of these complaints, arguing that either Section 522(f) cannot be construed to reach liens which predate enactment of the Code, or it violates the Fifth Amendment to the Constitution.

For purposes of this motion, it is assumed that all allegations of the complaints are true, and that each requirement of Section 522(f) is satisfied,[3] leaving only the issues of retroactivity and constitutionality for decision. These issues will be approached by reviewing the background and purpose of Section 522(f), then determining whether it was intended to affect preenactment security interests, and finally asking whether it is constitutional. Constitutionality involves congressional power to regulate bankruptcies as well as Fifth Amendment limitations on that power. Fifth Amendment analysis involves the taking clause, retroactive due process, and substantive due process.

### SECTION 522(f) AND ITS LEGISLATIVE PURPOSE

Exemptions under the Code have been expanded and restructured with several

---

1. 11 U.S.C. Section 522(f)(2) provides:

   (f) Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—

   .  .  .  .  .

   (2) a nonpossessory, nonpurchase-money security interest in any (A) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor; (B) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; or (C) professionally prescribed health aids for the debtor.

2. The Code, as used in this opinion, refers to the Bankruptcy Reform Act of 1978, codified at 11 U.S.C. Sections 101 et seq., Pub.L.No. 95–598, 92 Stat. 2549 (1978). The Code was enacted on November 6, 1978 and became effective on October 1, 1979. According to the allegations of the complaints, the security interests in the Geigle and Pillow cases predate enactment of the Code. The security interest in the Horton case was created during the interim between passage and operation. The security interest in the Revello case was created in the post-effective period. The parties have distinguished, in connection with the constitutional issues, between these three time frames. For purposes of this opinion, however, all security interests will be treated as though they came into existence prior to enactment of the Code.

3. See, e. g., 2A Moore's Federal Practice, ‘ 12.08 (2d ed. 1979). Avco filed an answer which controverts several material allegations of the complaint in the Geigle case. No answers have been filed in the other cases because at a preliminary pretrial conference held on May 27, 1980 it was decided to consolidate these cases for the purpose of hearing this motion to dismiss with a view toward a possible expeditious resolution of all four matters. Of course, denial of the motions will not preclude Avco from answering and raising any relevant defense under Section 522(f), for example, whether the collateral consists of household furnishings and so forth, held primarily for the personal, family, or household use of the debtor or a dependent of the debtor. Compare, e. g., In re Ruppe, 3 B.R. 60 (Bkrtcy., D.Colo. 1980) (movie camera and two projectors not household furnishings or goods under Section 522(f)) with In re Coleman, 5 B.R. 76, 6 B.C.D. 669 (Bkrtcy., M.D.Tenn.1980) (home entertainment items, such as component stereo system, are household furnishings or goods under Section 522(f)).

ends in view.[4] Section 522(f)(2) was designed to avoid nonpossessory, nonpurchase-money liens to the extent they impair exemptions for certain living necessities, tools of trade, and health aids. The legislative history, *see, e. g.*, H.R.Rep.No.95–595, 95th Cong., 1st Sess., 126–127 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787, shows that it was intended to discourage practices by creditors believed inimical to the rehabilitation of consumer debtors. Among those noted are "dragnet" security interests in household goods. Congress found that creditors, when taking such interests, neither expect nor intend to provide a hedge against default on their loans. These goods have ordinarily depreciated to "garage sale" value, if any. Administrative burdens and expenses, as well as the absence of any market, make salvage and resale impracticable. Most often, such interests would not exist but for the threat of repossession which they permit. Few debtors, fearing the loss of bedding, furniture, and clothes, and unable to afford their replacement, are willing to call the lender's bluff. Many, therefore, reshoulder liabilities once discharged in bankruptcy. Indeed, this "reaffirmation" may occur, in practical effect, without the procedural safeguards mandated in the Code.[5] Congress sought to ameliorate these conditions because it felt that "adhesion contracts," *id.* at 127, U.S.Code Cong. & Admin.News 1978, p. 6088, often conceived in consumer ignorance, should not be allowed to hold hostage the debtor's "fresh start."

## STATUTORY CONSTRUCTION

■ Section 522(f) should be construed, if possible, to avoid treatment of constitutional questions. *See, e. g., Wright v. Vinton Branch*, 300 U.S. 440, 461, 57 S.Ct. 556, 561, 81 L.Ed. 736 (1937) (hereinafter called *Vinton Branch*). For this reason, courts are reluctant to imply retroactivity, *see, e. g., Edgar v. Fred Jones Lincoln Mercury*, 524 F.2d 162, 165 (10th Cir. 1975), and *Gibbons v. Pan American Petroleum Corp.*, 262 F.2d 852, 855 (10th Cir. 1958), although bankruptcy statutes, like other curative and remedial legislation, historically have applied to contract and property rights which predate their enactment. *See, e. g., Hanover*

---

4. For a general discussion of exemptions pursuant to Section 522, as well as their underlying policies and purposes, *see, e. g.*, 3 Collier on Bankruptcy, §§ 522.01 *et seq.* (15th ed. 1980); P. Murphy, Creditors' Rights in Bankruptcy, §§ 17.12 *et seq.* (1980); Aaron, "The Bankruptcy Reform Act of 1978: The Full-Employment-For-Lawyers Bill, Part II," 1979 Utah L.Rev. 175; and Hughes, "Code Exemptions: Far-Reaching Achievements," 28 DePaul L.Rev. 1025 (1979).

5. 11 U.S.C. Sections 524(c) and (d) contain procedural safeguards which, according to one commentator, make reaffirmation of consumer debts a "virtual impossibility." P. Murphy, Creditors' Rights in Bankruptcy, § 17.09 at 17–21 (1980). An agreement of reaffirmation must be made prior to discharge, and may be rescinded within 30 days after it "becomes enforceable." In the case of individuals and consumer debts, defined at 11 U.S.C. Section 101(7), not secured by real property of the debtor, a hearing at which the debtor is present must be held where the Court, in essence, instructs the debtor that he is not obligated to reaffirm and that certain consequences may follow reaffirmation. The Court may approve the agreement only after determining that it does not impose "an undue hardship on the debtor or a dependent of the debtor" and is "in the best interest of the debtor," or is in good faith and a settlement of litigation over dischargeability or for redemption under 11 U.S.C. Section 722.

Creditors unwilling to run the gamut of Section 524 may approach the debtor privately after discharge and solicit reaffirmation. Although such behavior runs afoul of 11 U.S.C. Section 524(a)(2), which forbids "any act" to collect the debt from the debtor or his property, *see* 3 Collier on Bankruptcy, § 523.01[1] at 524–7 (15th ed. 1980) ("With Section 524(a), however, Congress has gone one step further ... to encompass the enjoining of any act to collect a discharged debt such as dunning by telephone or letter, or indirectly through friends, relatives, or employees, harassment, threats of repossession and the like") (emphasis supplied), creditors may accept this risk if they believe that debtors will not blow the whistle or that enforcement of a lien (assuming avoidance was not permitted under Section 522(f), and it therefore survived discharge) is justifiable under the Code, *see id.*, ᶜ 524.01[3] at 324–9, notwithstanding Section 524(a)(2). This may encourage an end run around Sections 524(c) and (d) and allow *de facto* reaffirmation of many debts discharged in bankruptcy.

*and Campbell v. Alleghany Corp.,* 75 F.2d 947, 950 (4th Cir. 1935).

■ Ultimately, however, the issue of prospective or retroactive construction turns on legislative intent. *See, e. g., Edgar v. Fred Jones Lincoln Mercury, supra* at 165, and *Gibbons v. Pan American Petroleum Corp., supra* at 844. Avco cites House and Senate commentaries on 11 U.S.C. Section 522(c) which emphasize that "the bankruptcy discharge will not prevent enforcement of valid liens. The rule of *Long v. Bullard,* 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004 (1886), is accepted with respect to the enforcement of valid liens on nonexempt property as well as on exempt property." H.R.Rep.No.95–595, 95th Cong., 1st Sess., 361 (1977), U.S.Code Cong. & Admin.News 1978, p. 6317. This language, it maintains, demonstrates that lien avoidance under Section 522(f) should not be given an *ex post facto* reading.

This view is unpersuasive for several reasons. First, the language cited does not, by its terms, or in context, assign a temporal framework to Section 522(c). Nor does the *Long* case bear on this point.

Second, the language purports to interpret Section 522(c) not Section 522(f). Both the wording of Section 522(f) and legislative analysis show, not only that it sanctions lien avoidance, but also that it relates to claims existing when the Code was passed. *Id.* at 362, U.S.Code Cong. & Admin.News 1978, p. 6318.

Finally, this view overlooks Pub.L.No.95–598, Sections 401 and 402 which repealed the Bankruptcy Act of 1898 as amended and substituted the Code to govern cases commencing after October 1, 1979. Congress must have intended Section 522(f) to reach pre-enactment security interests, because otherwise there would be a hiatus in the coverage of the bankruptcy laws. Thus, retroactive application of Section 522(f) is inescapable.[6]

## CONSTITUTIONALITY

Because Section 522(f) is construed retrospectively, the challenge to its constitutionality must be addressed. This challenge is based on the Fifth Amendment, but is balanced through consultation with Article I, Section 8, Clause 4 which authorizes Congress to pass laws concerning the "subject of bankruptcies." First, therefore, the nature and breadth of congressional power must be examined, so that any limitations on that power may be placed in perspective. Next, the impact of three elements of the Fifth Amendment must be weighed: (1) whether Section 522(f) involves a taking of private property for public purposes without just compensation; (2) whether retroactive application of Section 522(f) involves a deprivation of property without due process; and (3) whether Section 522(f) violates substantive due process.

### A. Congressional Power to Regulate the Subject of Bankruptcies

The inadequacy of colonial insolvency laws and the concomitant "disunity of the mercantile structure" gave impetus to a constitutional provision whereby Congress "was to have an all-inclusive power ... to enact legislation reasonably framed and related to the subject of bankruptcies, which in turn is indissolubly linked to commerce and credit." 1 Collier on Bankruptcy, ¶ 0.02 at 4–5 (14th ed. 1974) (emphasis omitted). The result was Article I, Section 8, Clause 4 which provides that Congress shall have power "to establish ... uniform laws on the subject of bankruptcies throughout the United States."

"All agree," wrote Chief Justice Marshall in *Sturges v. Crowninshield,* 17 U.S. 122, 4 Wheat. 122, 192, 4 L.Ed. 529 (1819), that "the power is both unlimited and supreme." It has been measured in part by the term

---

**6.** To date, at least 10 published opinions have considered this issue; only two have refused to give Section 522(f) retrospective application. *Compare,* e. g., *In re Hoops,* 3 B.R. 635, 6 B.C.D. 273, 274–275 (Bkrtcy., D.Colo.1980) (retroactive construction) with *In re Pierce,* 4 B.R. 671, 6 B.C.D. 484 (Bkrtcy., W.D.Okl.1980) (prospective construction) and *In re Malpeli,* 7 B.R. 508, [Current Binder] CCH Bank.L.Rep., ' 67,705 (N.D.Ill., November 24, 1980) (prospective construction). Neither the *Pierce* nor the *Malpeli* opinion mentions Pub.L.No.95–598, Sections 401 and 402 or their impact on the construction of Section 522(f).

"bankruptcies" which, although "incapable of final definitio̤," *Wright v. Union Central Ins. Co.*, 304 U.S. 502, 513, 58 S.Ct. 1025, 1031, 82 L.Ed. 1490 (1938) (hereinafter called *Wright*), has been interpreted "uniformly in the direction of progressive liberalization." *Continental Bank v. Rock Island Ry.*, 294 U.S. 648, 668, 55 S.Ct. 595, 602, 79 L.Ed. 1110 (1935) (hereinafter called *Continental*). "Bankruptcies," for example, are not restricted to any class of persons, such as traders or merchants, but may include farmers, corporations, and municipalities. Petitions may be voluntary or involuntary. Compositions and reorganizations as well as liquidations have been allowed. The adjudication of rights not only of creditors but also of third parties, such as purchasers at judicial sales, has been permitted. The prerogatives of trustees have been enlarged.[7]

> The fundamental and radically progressive nature of these extensions becomes apparent upon their mere statement; but all have been judicially approved or accepted as falling within the power conferred by the bankruptcy clause of the Constitution. Taken altogether, they demonstrate in a very striking way the capacity of the bankruptcy clause to meet new conditions as they have been disclosed as a result of the tremendous growth of business and development of human activities from 1800 to the present day. *And these acts, far-reaching though they be, have not gone beyond the limit of congressional power; but rather have constituted extensions into a field whose boundaries may not yet be fully revealed.* *Continental, supra* at 671, 55 S.Ct. at 604 (emphasis supplied).

This language suggests that "the constitutional grant of power over the subject of bankruptcies embraces the entire field of debtor-creditor relationships for the purpose of equitable distribution of a debtor's estate, rehabilitation of the debtor, and protection of the credit structure against anything materially contributing toward its impairment." 1 Collier on Bankruptcy, *supra*, ¶ 0.02 at 6. In short, the power is " 'general, unlimited, and unrestricted over the subject.' " *Id.* at 6.1.[8]

But congressional superintendence of bankruptcies has aroused virulent political opposition. As Justice Cardozo has said, "the history [of the 'subject of bankruptcies'] is one of an expanding concept. It is, however, an expanding concept that has had to fight its way." *Ashton v. Cameron County Dist.*, 298 U.S. 513, 535, 56 S.Ct. 892, 898, 80 L.Ed. 1309 (1936) (dissenting opinion). Antebellum America witnessed only two bankruptcy acts. The first in 1800 was denounced as "partial, immoral . . . impolitic . . . anti-Republican" and survived two and one half years; the second, in 1841, was "repealed with even more indecent haste." L. Friedman, A History of American Law, 238 (1973).

In 1867, a new law allowed involuntary bankruptcy. This, complained its adversaries, meant that the "free and easy but honest and true men of the West," the "farmers and merchants," could be "squeezed" in a "straitjacket" more "befitting the madmen of Wallstreet." Northern creditors "hoped to use the bankruptcy law to reclaim at least a pittance from ruined debtors in the South. They felt that only a federal law, federally administered could stave off the state laws granting stays and exemptions, and keep the prejudices of

---

**7.** *See, e. g., United States v. Speers*, 382 U.S. 266, 86 S.Ct. 411, 15 L.Ed.2d 314 (1965) (trustee powers); *Wright, supra* 304 U.S. at 514–516, 58 S.Ct. at 1032–1033 (purchasers at judicial sale); *United States v. Bekins*, 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137 (1938) (municipalities); *Vinton Branch, supra*, 300 U.S. at 456, 57 S.Ct. at 559 (farmers); *Continental, supra*, 294 U.S. at 670–675, 55 S.Ct. at 603–605 (corporations, voluntary or involuntary, reorganization or liquidation); *Wilmot v. Mudge*, 103 U.S. 217, 26 L.Ed. 536 (1880) (compositions).

**8.** Collier is quoting *In re Reiman*, 20 F.Cas. 490 (11,673) (D.C.N.Y.), which, in turn, is cited with approval in *Louisville Bank v. Radford*, 295 U.S. 555, 588 n. 18, 55 S.Ct. 854, 862 n. 18, 79 L.Ed. 1593 (1935), *Continental, supra*, 294 U.S. at 672, 55 S.Ct. at 604, and *Hanover National Bank v. Moyses*, 186 U.S. 181, 187, 22 S.Ct. 857, 860, 46 L.Ed. 1113 (1902).

Southern juries at bay." *Id.* at 480. A movement to repeal was thwarted in 1874 only to succeed in 1878.

By 1889, new bills were in the pipeline. These were opposed by southern and western debtors who preferred local measures more sympathetic to their interests, and were criticized as a "crushing and damnable instrumentality," an "infernal engine of ruin," the "last screw in the coffin of liberty," a plot to deliver "farmers, laborers, debtors, or small dealers" into the "soulless cupidity of a Shylock." *Id.* at 482. Compromises ultimately resulted in passage of the Bankruptcy Act of 1898, which, with amendments, remained the law of the land until enactment of the Code.

In short, "few legal relationships have led to more ceaseless agitation ... than the relationship between debtor and creditor." *Id.* at 239–240. Many Americans believed the discharge of debtors in bankruptcy to be sinful. These sentiments found ready expression by editors, like Hezekiah Niles, who labeled such laws *"acts for the encouragement of roguery"* and lamented the eclipse of "moral rectitude and republican virtue." P. Coleman, Debtors and Creditors in America, 280 (1974) (emphasis in original). *See also id.* at 272.[9]

Bankruptcy laws followed the business cycle, with political hyperbole at a premium during times of panic and shaky credit. Rivalries likewise developed along party and sectional lines. Democrats in the 1830s, for example, used the threat of bankruptcy legislation in their war against the "moneyed conspiracy" in general and the national bank in particular. *See, e. g.,* D. Beesley, The Politics of Bankruptcy in the United States, 1837–1845 (1968).

States favored, in Daniel Webster's term, a "hydra-headed" approach which keyed insolvency laws to provincial advantage, as in Virginia which forbade execution on land. This reflected not only an economic prefer-ence but also a political reaction since a *tenant-in-elegit* retained title to the land and hence his franchise. P. Coleman, Debtors and Creditors in America, *supra* at 19 and 277–278.

In this maelstrom of conflicting interests, it is not surprising that the constitutional pedigree of most bankruptcy legislation has been assailed. "Thus, it was at first contended that, constitutionally, such a law must be confined to the lines of the English statute; next, that it could not discharge prior contracts; next, that a purely voluntary law would be non-uniform and therefore unconstitutional; next, that any voluntary bankruptcy was unconstitutional; next, that there could be no discharge of debts of any class except traders; next, that a bankruptcy law could not apply to corporations; next, that allowance of State exemptions of property would make a bankruptcy law non-uniform; next, that any composition was unconstitutional; next that there could be no composition without an adjudication in bankruptcy; next, that there could be no sale of mortgaged property free from the mortgage. All these objections, so hotly and frequently asserted from period to period were overcome either by public opinion or by the Court." C. Warren, Bankruptcy in United States History, 9–10 (1935).

The bankruptcy power has realized and sustained this breadth despite repeated constitutional attacks, which often camouflaged partisan social or economic objections. Hence, courts must be wary of making business ideologies or special interests the measure of constitutionality or, indeed, of politicizing the litigation of constitutional issues, lest that instrument become " 'a nose of wax in the hands of some gentlemen who can always make it into just what fashion it pleases them.' " *Id.* at 32 (citation omitted). This lesson, easily stated but

---

9. Indeed, this attitude may account for the flinty dicta of Mr. Justice Hyde: "If a man is taken in execution and be in prison for debt, neither the plaintiff at whose suit he is arrested, nor the sheriff who took him, is bound to find him meat, drink, or clothes; but he must live on his own, or on the charity of others: and if no man will relieve him, let him die in the name of God, says the law; and So say I." *Manby v. Scott*, 1 Mod. 132 (Exchequer Chamber 1663) as quoted in 2 J. Goebel, ed., The Law Practice of Alexander Hamilton, 328 (1969).

frequently forgotten, is nowhere more important than in discussions of Fifth Amendment limitations on the bankruptcy power.

## B.   Fifth Amendment Limitations

The point of departure for Fifth Amendment analysis of Section 522(f) must be *Louisville Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935) (hereinafter called *Radford*); most courts have considered the constitutionality of Section 522(f) to "squarely depend on the continuing vitality" of this precedent. *In re Hoops*, 3 B.R. 635, 6 B.C.D. 273, 274 (Bkrtcy., D.Colo.1980).

*Radford* struck down Section 75(s) of the Frazier-Lemke Act of 1934 which suspended mortgage foreclosures on real property during a five year period in which the mortgagor was allowed possession while paying a fair rental value which was disbursed among secured and unsecured creditors. The mortgage was cancellable by paying an appraised price for the property at the beginning or end of the moratorium, at the option of the mortgagee.

The Court held that the bankruptcy power of Congress is subject to the Fifth Amendment. Pursuant to this power, Congress may "discharge the debtor's personal obligation, because, unlike the states, it is not prohibited from impairing the obligations of contracts."

But the effect of the act here complained of is not the discharge of Radford's personal obligation. *It is the taking of substantive rights in specific property acquired by the bank prior to the act.*

.     .     .     .     .

The controlling purpose of the act is to preserve to the mortgagor the ownership and enjoyment of the farm property. *It does not seek primarily a discharge of all personal obligations; a function with which alone bankruptcy acts have heretofore dealt.* Nor does it make provision of that nature by prohibiting, limiting, or postponing deficiency judgments, as do some state laws. *Its avowed object is to take from the mortgagee rights in the specific property held as security; and to*

*that end "to scale down the indebtedness" to the present value of the property. Radford, supra,* 295 U.S. at 589–590 and 594, 55 S.Ct. at 863 and 865 (emphasis supplied).

The Court outlined five "property rights" recognized by state law of which the mortgagee had been deprived. These grew out of its prerogative to retain the lien until the debt was paid and to protect its interest in the property through foreclosure. *Id.* at 594–595, 55 S.Ct. at 865–866.

As a postscript, the Court observed that its province was:

. . . limited to deciding whether the Frazier-Lemke Act as applied has taken from the Bank without compensation and given to Radford rights in specific property which are of substantial value . . . As we conclude that the Act as applied has done so, we must hold it void. For the Fifth Amendment commands that, however great the Nation's need, private property shall not be thus taken even for a wholly public use without just compensation. If the public interest requires, and permits, the taking of property of individual mortgagees in order to relieve the necessities of individual mortgagors, resort must be had to proceedings by eminent domain; so that, through taxation, the burden of the relief afforded in the public interest may be borne by the public. *Id.* at 601–602, 55 S.Ct. at 868–869.

*Radford* thus encompasses a trilogy of Fifth Amendment issues: taking, retroactivity, and substantive due process. The impact of these issues on Section 522(f) determines its constitutionality.

### 1.   The Taking Clause

The Fifth Amendment proscribes the taking of private property for public use without just compensation. Its relation to Section 522(f), however, "must be construed in the light of the universal understanding of the people when the constitutions were adopted that participation in the protection and other benefits which an organized government affords is the only compensation to which an individual is entitled for the interference with certain of his

property rights." 2 Nichols', The Law of Eminent Domain, § 6.1 at 6–5 (rev. ed. 1979). Thus, war and taxation may result in the confiscation of property without violating the Fifth Amendment. *Id.* at 6–5 and 6–6. State police powers may outlaw an entire business. *See, e. g., Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963) (debt adjustment without license to practice law); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (ophthalmology). Commerce clause powers have removed products from the marketplace. *See. e. g,. United States v. Carolene Products Co.,* 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) (filled milk); *Century Arms, Inc. v. Kennedy,* 323 F.Supp. 1002 (D.Vermont 1971) (firearms importation). Surely the bankruptcy power, which is of equal dignity with the commerce clause, *see, e. g.,* 1 Collier on Bankruptcy, *supra,* ¶ 0.02 at 5, justifies avoidance of liens on property. *Cf. New Haven Inclusion Cases,* 399 U.S. 392, 489–495, 90 S.Ct. 2054, 2108–2111, 26 L.Ed.2d 691 (1970), criticized in Note, "Takings and the Public Interest in Railroad Reorganization," 82 Yale L.J. 1004 (1973); P. Murphy, Creditors' Rights in Bankruptcy, § 6.02 at 6–7 (1980). *See also* the discussion below on the history of lien avoidance in bankruptcy.

At bottom, the language on taking in *Radford* may be rhetorical flourish. Lien avoidance under Section 522(f), pursuant to congressional power to regulate the subject

of bankruptcies, and for the purpose of preventing enforcement of security interests which stifle a debtor's fresh start, does not come within the traditional definitions of taking under the Fifth Amendment.[10] Later decisions, while permitting erosion of mortgagee rights protected in *Radford,* are silent on taking. *See, e. g., Vinton Branch, supra; Adair v. Bank of America Assn.,* 303 U.S. 350, 58 S.Ct. 594, 82 L.Ed. 889 (1938) (hereinafter called *Adair*); *Wright, supra; Wright v. Union Central Life Ins. Co.,* 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed.2d 184 (1940) (hereinafter called *Union Central*). Only two (out of at least 19) published opinions applying *Radford* to Section 522(f) have raised the issue; neither gives it serious consideration. *See In re Hoops, supra,* 3 B.R. 635, 6 B.C.D. at 274; *In re Baker,* 5 B.R. 397, 399–400 (Bkrtcy., W.D.Miss.1980). It is fair to conclude that this aspect of *Radford* has no precedential value, and that it does not influence the constitutionality of Section 522(f).[11]

### 2. Retroactivity

Whether and to what extent *Radford* holds that retroactive impairment of mortgagee rights violates due process is uncertain. The bank primarily contended that the "Act, even if applied to mortgages thereafter executed, would transcend the bankruptcy power," but argued alternatively that "in any event, to apply it to preexisting mortgages violates the Fifth Amendment." *Radford, supra,* 295 U.S. at 578, 55

---

**10.** *See generally* Dunham, "*Griggs v. Allegheny County* in Perspective: Thirty Years of Supreme Court Expropriation Law," 1962 Sup.Ct. Rev. 63; Sax, "Takings, Private Property and Public Rights," 81 Yale L.J. 149 (1971); Sax, "Takings and the Police Power," 74 Yale L.J. 36 (1964).

**11.** One commentator has indicated that "no later opinion has substantially contradicted the basic holding of *Radford* that a significant infringement of a substantive property right held by a secured creditor constitutes an uncompensated taking within the meaning of the final clause of the fifth amendment." Murphy, "Restraint and Reimbursement: The Secured Creditor in Reorganization and Arrangement Proceedings," 30 Bus.Law. 15, 26 (1974). However, Murphy has rephrased the *Radford* language on taking which said that lien removal

before payment of the debt *in full* and not merely a "significant infringement of substantive property rights held by a secured creditor" was impermissible. *See Radford, supra* at 579–85 and 596, 55 S.Ct. at 858–61 and 866. The Court could not have meant that, absent this kind of lien retention, a taking would occur, since later cases allowed lien removal and purchase of property at appraised values. *See, e. g., Union Central, supra.* Historically, lien rights have entitled their holders to the value of the collateral and no more in bankruptcy. This has been the rule since antiquity. Indeed, it is called the "bankruptcy rule." *See, e. g., Merrill v. National Bank of Jacksonville,* 173 U.S. 131, 19 S.Ct. 360, 43 L.Ed. 640 (1899); Dunham, "Creditors' Claims in Bankruptcy: A Plea for Complete Adoption of the Bankruptcy Rule," 52 Am.Bank.L.J. 299 (1978).

S.Ct. at 857. The opinion straddles these views, suggesting that Congress "may" have greater power to affect mortgages, if exercised prospectively, and that the power to deal with preexisting liens "may" be limited, depending on the severity of treatment. *Radford, supra* at 581 and 589, 55 S.Ct. at 859 and 863.

This blurring of rationales is perpetuated in cases following *Radford* in their analysis of Section 522(f). Most employ a substantive due process formula, but generally no distinction with retroactivity is drawn.[12]

The confusion is understandable. Retroactivity comes through the back door in *Radford*, because it compromises substantive due process, which holds that it is the property affected and not the time of deprivation which counts. If the lien is inviolate, the date of violation is immaterial. To inform the mortgagee beforehand merely adds insult to injury. Put differently, if retroactivity is the villain, why the fuss about a property right? And if the property right is immutable, why vacillate over when it is taken? *Radford* does not resolve this antagonism between substantive due process and retroactivity. Its progeny suffer from the same conundrum.

It is improbable, however, that *Radford* disapproved retroactive interference with mortgagee rights since the entire history and purpose of bankruptcy law takes an opposing path.

Concerns over retroactive bankruptcy legislation were aired in the constitutional convention "when a motion by Nathaniel Gorham to place upon Congress the same prohibition as to impairing the obligation of contracts as had been laid upon the States failed." Had this been adopted, "no bankruptcy law could have discharged prior debts." C. Warren Bankruptcy in United States History, *supra* at 5–6.

Moreover, every bankruptcy law has been the product of some financial crisis or business depression; their *raison d'etre* has been to bring *ex post facto* relief to debtors. *Id.* at 9. Thus, when debating the Act of 1800, Congress struck a clause which would have prevented the discharge of preexisting debt. Congressman William Craik observed that "no system of bankruptcy could be formed without affecting in some degree the contracts in existence at the time." *Id.* at 14. Congressman James Bayard echoed these sentiments, nothing that it is a "just principle that when a man gives credit to another, he does it not only subject to the existing laws, but to all others which may be passed." *Id.*

Proposed legislation between 1818 and 1822 was likewise attacked on the grounds "that Congress could not, and should not, pass a retrospective bill affecting prior contracts." These arguments, however, "were strong on the moral but weak on the legal side; for all English bankruptcy laws, at the time of the Constitution and since, had applied to existing contracts." *Id.* at 30. *See also* Civis (pseudonym), Remarks on the Bankrupt Law: To Which Are Added, The Proposed Amendments of Hopkinson and Webster, 18–17 (1819).

Debate leading to passage of the Act of 1841 took retroactivity for granted. Indeed, the law was designed as "a temporary relief law, a mere sponge to wipe out the old scores of the present insolvent debtors." C. Warren, Bankruptcy in United States History, *supra* at 63.

The Act of 1867 was based on similar assumptions. *Id.* at 104–105. It was amended in 1872 and 1873 to grant debtors retroactive exemptive relief,[13] with Con-

---

12. *See, e. g., In re Rodrock*, 3 B.R. 629, 6 B.C.D. 267 (Bkrtcy., D.Colo.1980). This case dealt with a pre-enactment security interest. Retroactivity probably did not weigh heavily in the balance since the same court followed *Rodrock* in striking down Section 522(f) as applied to an interim judicial lien. *See In re Lucero*, 4 B.R. 659, 6 B.C.D. 477 (Bkrtcy., D.Colo.1980).

13. As explained by Warren, "the original Act of 1867 applied to State exemptions existing in 1864; but in 1864 many of the States were regarded as out of the Union, and their Constitutions and laws illegal and of no effect. Since the war, all the Southern and many Western States had adopted new constitutions and statutes providing for exemptions of property from execution; and these exemptions had been

gress stipulating that "the State exemptions existing in 1871 should be valid against prior debts, 'any decision of any such (State) Court rendered since the adoption and passage of such (State) Constitution and laws to the contrary notwithstanding.'" *Id.* at 111 (citation omitted). This measure was upheld by several lower federal courts, *id.* at 112 and 182–183 n. 21, while retroactive application of bankruptcy laws in general received the imprimatur of the Supreme Court in *Hanover National Bank v. Moyses*, 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113 (1902).

*Radford* may have cast a shadow over this history, although it was inconclusive, *see* C. Warren, Bankruptcy in United States History, *supra* at 156–159, and short-lived. None of the opinions coming in the wake of *Radford* questioned the retroactive application of Section 75(s). *See Vinton Branch, supra; Adair, supra; Wright, supra; Union Central, supra;* Sen.Rep.No. 985, 74th Cong., 1st Sess., 4 (1935). To the contrary, *Wright, supra* 304 U.S. at 516, 58 S.Ct. at 1033, observed that:

> The mortgage contract was made subject to constitutional power in the Congress to legislate on the subject of bankruptcies. Impliedly, this was written into the contract between petitioner and respondent. "Not only are existing laws read into contracts in order to fix obligations as between parties but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order." (Citation omitted.)

This is the short and inevitable answer to claims that retroactive application of the bankruptcy power is unconstitutional.[14]

### 3. Substantive Due Process

*Radford's* substantive due process holding has been the lightning rod for debate on Section 522(f), and the principal ground for declaring the statute void. *See In re Rodrock*, 3 B.R. 629, 6 B.C.D. 267 (Bkrtcy., D.Colo.1980) (J. Moore); *In re Hoops, supra* (J. Keller); *In re Jackson*, 4 B.R. 293 (Bkrtcy., D.Colo.1980) (J. Clark and McGrath); *In re Lucero*, 4 B.R. 659, 6 B.C.D. 477 (Bkrtcy., D.Colo.1980) (J. Moore); *In re Malpeli*, 7 B.R. 508 [Current Binder] CCH Bank.L.Rep., ¶ 67,705 (N.D.Ill., November 24, 1980) (J. Eisen). *Cf. In re Hawley*, 4 B.R. 147, 6 B.C.D. 365 (Brktcy., D.Or. 1980) (holding turns more on retroactivity than substantive due process).

Cases upholding the statute, on the other hand, have been hesitant to face the subject squarely. *See In re Manning*, [Current Binder] CCH Bank.L.Rep., ¶ 67,714 (M.D. Fla., October 20, 1980); *In re Beck*, 4 B.R. 661, 6 B.C.D. 491 (Bkrtcy., C.D. Ill.1980) (J. Coutrakon); *In re Boulton*, 4 B.R. 498, 6 B.C.D. 223 (Bkrtcy., S.D.Iowa 1980) (trial courts should defer to appellate courts on questions of constitutionality); *In re Primm*, 6 B.R. 142 (Bkrtcy., D.Kan.1980); *In re Steinart*, 4 B.R. 354, 6 B.C.D. 623 (Bkrtcy., W.D.La.1980) (would follow *Rodrock* where pre-enactment lien involved); *In re Baker, supra* (deference to appellate courts); *In re Bradford*, 6 B.R. 741, 6 B.C.D. 75 (Bkrtcy., D.Nev.1980); *In re Fisher*, 6 B.R. 206 (Bkrtcy., N.D.Ohio 1980) (J. White); *In re Ambrose*, 4 B.R. 395, 6 B.C.D. 454 (Bkrtcy., N.D.Ohio 1980) (J. White); *In*

---

greatly increased in amount; the debtors saw great advantage in having the Bankruptcy Act amended." *Id.* at 110. *See also* P. Coleman, Debtors and Creditors in America, *supra* at 25–26.

**14.** The Court is satisfied that retroactivity is no obstacle to the constitutionality of Section 522(f), because these cases, involving impairment of mortgagee rights as severe as *Radford*, are either indifferent to the issue or, indeed, as the quotation from *Wright* indicates, endorse *ex post facto* treatment. The Court is aware that several commentators have offered a more comprehensive and sophisticated analysis of the retroactivity problem. *See, e. g.,* Greenblatt, "Judicial Limitations on Retroactive Civil Legislation," 51 Nw.U.L.Rev. 540 (1956); Hochman, "The Supreme Court and the Constitutionality of Retroactive Legislation," 72 Harv. L.Rev. 692 (1960); Slawson, "Constitutional and Legislative Considerations in Retroactive Lawmaking," 48 Cal.L.Rev. 216 (1960). *Cf.* Plumb, "The Recommendations of the Commission on the Bankruptcy Laws—Exempt and Immune Property," 61 Va.L.Rev. 1 (1975). The various tests propounded in these examinations of the issue do not alter the conclusion reached above.

*re Curry*, 5 B.R. 282 (Bkrtcy., N.D.Ohio 1980) (J. White); *Rutherford v. Associates Financial Services Company of Ohio*, 4 B.R. 510 (Bkrtcy., S.D.Ohio, 1980) (J. Anderson); *In re Head*, 4 B.R. 521, 6 B.C.D. 489 (Bkrtcy., E.D.Tenn.1980).

Thoroughgoing treatment of substantive due process in this context should proceed in four parts. To begin, the "continuing vitality" of substantive due process as applied in *Radford* may be gauged by inspecting its five property rights and how they have fared under later decisions. This inspection reveals that each of these rights no longer enjoys Fifth Amendment protection, although a legacy persisted in the ruling of *Union Central, supra*, that mortgagees may be entitled to the value of their collateral. Second, the erosion of these particular rights follows the general elimination of substantive due process as a constitutional basis for protection of property rights.

Third, the substantive due process rationale of *Radford* is, in any event, inapplicable to Section 522(f). Finally, the *Radford* rationale was, in fact, incorrectly applied to the bankruptcy clause of the Constitution.

### (a) The Fire Property Rights of Radford

*Radford* spoke of a mortgagee's right to retain his lien until paid, to conduct a judicial sale, to control the time of that sale, to bid at that sale, and to control the property and receive rents between default and sale. Section 75(s) was amended on August 28, 1935, 49 Stat. 973–975 c. 792, within four months after the decision in *Radford*. It was said to preserve three of the five property rights of *Radford* and was upheld as constitutional in *Vinton Branch*. The cases of *Adair, supra, Wright, supra*, and *Union Central, supra*, followed in rapid succession and dismembered the remainder of these rights.[15]

---

**15.** An account of this dismemberment follows. The first right mentioned in *Radford* is "to retain the lien until the indebtedness secured is paid." *Radford, supra*, 295 U.S. at 594, 55 S.Ct. at 865. Lien retention *per se* was not at issue because Section 75(s) as then enacted provided that the farm remain with the debtor "subject to liens." *Id.* at 577, 55 S.Ct. at 857. The Court meant lien retention until the debt is paid *in full*. *Id.* at 579–580 and 596, 55 S.Ct. at 858–859 and 866.

This feature of the opinion, however, was discounted when *Adair, supra*, allowed sale of crops free from a chattel mortgage and deduction of the costs of harvesting and administration from gross proceeds, despite an outstanding obligation. Later in *Union Central, supra*, mortgagors were given the right to purchase their property at an appraised value, despite a debt which exceeded collateral by $10,000. The bank received "the value of the property ... There is no constitutional claim of a creditor to more than that." *Id.* 311 U.S. at 278, 61 S.Ct. at 200. Hence, lien retention until the debt is paid in full, which Avco insists on here, has not survived as an aspect of *Radford*. Creditors may at least be forced to accept the value of the collateral in exchange for the lien. (*Radford, supra*, suggests that sales of property free of encumbrances "will not be ordered by the bankruptcy court *if it appears that the* amount of the encumbrance exceeds the value of the property," and that "where the mortgaged property is sold free of liens for less than the amount of the liens, the bankrupt estate and not the lienholders must bear the costs of the sale." *Id.* 295 U.S. at 584 and n. 14, 55 S.Ct. at 860 and n. 14. *But see Union Central*,

*supra*, and *Adair, supra* 303 U.S. at 361 and n. 8, 58 S.Ct. at 600 and n. 8.)

The second right mentioned in *Radford* is "to realize upon the security by a judicial public sale." *Radford, supra*, 295 U.S. at 594, 55 S.Ct. at 865. Of course, it was settled prior to *Radford* that foreclosure sales could be postponed under bankruptcy law. *See, e. g., Continental, supra*. This right was further compromised by dicta in *Vinton Branch, supra*, which observed that "a court of bankruptcy may affect the interest of lien holders in many ways," including sale of property free of encumbrances. *Id.* 300 U.S. at 470, 57 S.Ct. at 565. That this sale need not be judicial or public was confirmed in *Adair, supra*, and especially in *Union Central, supra*, where foreclosure was superseded by the debtor's right to purchase at appraised values.

The third and fourth rights are "to determine when such sale shall be held, subject only to the discretion of the court" and "to protect its interest in the property by bidding at such sale whenever held, and thus to assure having the mortgage property devoted primarily to the satisfaction of a debt, either through receipt of the proceeds of a fair competitive sale or by taking the property itself." *Radford, supra* 295 U.S. at 594–595, 55 S.Ct. at 865–866. Naturally, with the demise of any right to realize upon the collateral through foreclosure, and the substitution of purchase at appraised values, any options as to timing or bidding became meaningless. Indeed, in *Vinton Branch, supra* the bank argued without effect that it held a trust deed (rather than a mortgage as in *Radford*) and that the suspension of its "peremptory"

Several authorities have acknowledged this result. One, for example, notes the merely "cosmetic" changes between the old and amended Section 75(s), P. Murphy, Creditors' Rights in Bankruptcy, *supra* § 6.02 at 6–6; another remark that the two versions were "not materially different." *Securities and Exchange Commission v. Albert & Maguire Securities Co., Inc.*, 378 F.Supp. 906, 912 (E.D.Pa.1974).[16] *See also* Rosenberg, "Beyond *Yale Express*: Corporate Reorganization and the Secured Creditor's Rights of Reclamation", 123 U.Pa.L. Rev. 509, 522 n. 45 (1975) ("When one compares the provisions struck down in *Radford* with those upheld in *Wright*, the substantive similarities and merely formal differences are transparent").

Given this basic continuity, it is fair to say that *Vinton Branch* overrules *Radford.* This was the result intended by Congress. Although it makes an obligatory nod to substantive due process, the Senate Report on the new Section 75(s) reads like a brief in opposition, arguing at one point that " 'a secured debt or lien is, so far as the Consti-

tution of the United States is concerned, a no more sacred kind of property than an unsecured debt.' " Sen.Rep.No. 485, 74th Cong., 1st Sess., 5 (1935) (citations omitted). *Compare Radford, supra,* 295 U.S. at 588–589, 55 S.Ct. at 862–863.

It is also the conclusion drawn in *Helvering v. Griffiths,* 318 U.S. 371, 63 S.Ct. 636, 87 L.Ed. 843 (1943). There the Court, in a moment of introspection, finds "no reason to doubt that this Court may fall into error as may other branches of the Government." *Id.* at 400, 63 S.Ct. at 651. Going further, it concludes that "nothing in the history or attitude of this Court should give rise to legislative embarrassment if in the performance of its duty a legislative body feels impelled to enact laws which may require the Court to reexamine its previous judgments or doctrine." *Id.* at 400–401, 63 S.Ct. at 651–652. Here the opinion footnotes a number of cases, many of which were the offspring of "judicial activism" in the first third of this century and the decisions overruling them. In the thick of this citation is the following: "Compare also *Wright v.*

right to foreclose was correspondingly more severe. The right of mortgagees to bid for the property at sales was emphasized in *Radford, supra,* 295 U.S. at 584–585, 55 S.Ct. at 860–861 and *Vinton Branch, supra* at 459–460 and 468, but abandoned in *Union Central, supra. See also* Sen.Rep.No.985, 74th Cong., 1st Sess., 6 (1935) ("Nor is it unconstitutional to limit or prohibit the mortgagee from bidding at an auction sale. In fact, the mortgagee is generally prohibited from bidding at his own sale, unless that right is given to him by statute or contract").

The final right was to control the property "during the period of default, subject only to the discretion of the court, and to have the rents and profits collected by a receiver for the satisfaction of the debt." *Radford, supra,* 295 U.S. at 595, 55 S.Ct. at 865.

This right was displaced in *Vinton Branch, supra,* 300 U.S. at 465–470, 57 S.Ct. at 563–565, which validated the amended Section 75(s), permitting mortgagor possession during a moratorium of three years. The opinion reassured mortgagees that the length of this period could be shortened by the court or the stay ended where the debtor failed in payments of rent, disobeyed court orders, or showed no prospects for rehabilitation. Even these mitigating measures, however, were read out of Section 75(s) in *Union Central, supra,* where the trial court made findings on each of these points to sup-

port termination of the stay, but the Supreme Court reversed, granting the debtor an unqualified right to redeem at appraised values. See also *John Hancock Ins. Co. v. Bartels,* 308 U.S. 180, 184 and n. 3, 60 S.Ct. 221, 223 and n. 3, 84 L.Ed. 176 (1939) ("The subsections of § 75 which regulate the procedure in relation to the effort of a farmer-debtor to obtain a composition or extension contain no provision for dismissal because of the absence of a reasonable probability of the financial rehabilitation of the debtor"). As to rents collected during the interim, *Vinton Branch, supra,* allocated these first to taxes, insurance, and maintenance costs, with the remainder "to be distributed among the secured and *unsecured* creditors, and applied on their claims, as their interests appear" (emphasis supplied), a ruling arguably less favorable to secured creditors than the original Section 75(s). *Compare Radford, supra,* 295 U.S. at 576 and 592–593, 55 S.Ct. at 857 and 864–865.

Thus, each of the rights esteemed in *Radford,* when scrutinized on the facts of subsequent decisions, no longer enjoys Fifth Amendment protection.

16. The *Albert & Maguire* case mistakenly notes, however, that the new Section 75(s) was not retroactive in effect. *See id.*

*Vinton Branch* ... with *Louisville Joint Stock Land Bank v. Radford* ... as to farmer bankruptcy statutes." *Id.* at 401 n. 52, 63 S.Ct. at 652 n. 52.[17]

Commentators have thus been left to speculate on what, if anything, remains of substantive due process in *Radford. See, e. g.,* Rosenberg, *supra* at 552. There is the language of *Union Central* that secured creditors have a right to the value of their collateral, but whether this is merely the debris of *Radford,* unsupported by constitutional principle, may be questioned. *Compare, e. g.,* Murphy, "Restraint and Reimbursement: The Secured Creditor in Reorganization and Arrangement Proceedings," 30 Bus.Law. 15, 25 (1974) with P. Murphy, Creditors' Rights in Bankruptcy, *supra,* § 6.02 at 6–7. Recent cases have whittled away at the *Radford* formula,[18] although some tenets are still discussed. Indeed, one explanation for their longevity may be the immense literature they have spawned.[19] Mere repetition of a rule in treatises and casebooks, however, does not repair its constitutional deficiencies. The *Radford* rule,

which "appears to have sprung Athena-like from the brow of Mr. Brandeis," Rosenberg, *supra* at 520–521, has survived, if at all, without critical scrutiny. When viewed against the history of substantive due process, and the precedents of lien avoidance in bankruptcy, *Radford* ceases to control.

### (b) Substantive Due Process No Longer Provides Constitutional Support For Radford

Substantive due process is an elastic if not amorphous concept. Arthur Sutherland wrote in 1965, that "no one knows precisely what the words 'due process of law' meant to the draftsmen of the fifth amendment." Others have noted the "chameleon capacity," "protean quality," and "convenient vagueness" of these terms. Such vagueness, elevated to a "reigning orthodoxy" in the first third of this century, permitted judges to give their economic predilections constitutional sanction. Thus, due process was identified with "Herbert Spencer's social statics" and Adam Smith's invisible hand; *Lochner, Coppage, Adair,* and *Schec-*

---

**17.** A companion footnote, *see Helvering v. Griffiths, supra* 318 U.S. at 400 n. 51, 63 S.Ct. at 651 n. 51, suggests a parallel with *United States v. Bekins,* 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137 (1938) overruling *Ashton v. Cameron County Dist., supra,* and upholding the Municipal Bankruptcy Act.

**18.** *See, e. g., New Haven Inclusion Cases, supra; Reconstruction Finance Corp. v. Kaplan,* 185 F.2d 791 (1st Cir. 1950); *In re Bermec Corporation,* 445 F.2d 367 (2d Cir. 1971); *In re Yale Express System, Inc.,* 384 F.2d 990 (2d Cir. 1967); *In re Third Ave. Transit Corp.,* 198 F.2d 703 (2d Cir. 1952); *Matter of Blazon Flexible Flyer, Inc.,* 407 F.Supp. 861 (N.D.Ohio 1976).

**19.** *See, e. g.,* 5 Collier on Bankruptcy, "" 77.17 and 77.19 (14th ed. 1978); 6A *Id.,* " 10.16; 3 D. Cowans, Bankruptcy Law and Practice, § 1129 (2d ed. 1978); 10 H. Remington, A Treatise on the Bankruptcy Law of the United States, §§ 4005 and 4101 (Repl. vol. 1947); W. Blum and S. Kaplan, Corporate Readjustments and Reorganizations, 509–615 (1976); W. Blum and S. Kaplan, Materials on Reorganization, Recapitalization and Insolvency, 268–279 and 589–595 (1969); Coogan, Bronde, and Glatt, "Comments on Some Reorganization Provisions of the Pending Bankruptcy Bills," 30 Bus.Law. 1149 (1975); Coogan, "The New Bankruptcy Code: The Death of Security Interest?" 14 Ga.

L.R. 153 (1980); Countryman, "Real Estate Liens in Business Rehabilitation Cases," 50 Am.Bank.L.J. 303 (1976); Festersen, "Equitable Powers in Bankruptcy: Protection of the Debtor and the Doomsday Principle," 46 Am. Bank.L.J. 311 (1972); Murphy, "Use of Collateral in Business Rehabilitations: A Suggested Redrafting of Section 7–203 of The Bankruptcy Reform Act," 63 Cal.L.Rev. 1483 (1975); Murphy, "Restraint and Reimbursement: The Secured Creditor in Reorganization and Arrangement Proceedings," 30 Bus.Law. 15 (1974); Rosenberg, "Beyond *Yale Express*: Corporate Reorganization and the Secured Creditor's Rights of Reclamation," 123 U.Pa.L.Rev. 509 (1975); Webster, "Collateral Control Decisions in Chapter Cases: *Clear Rules v. Judicial Discretion,*" 51 Am.Bank.L.J. 197 (1977); Note, "Use of Secured Creditor's Collateral in Chapter X Reorganizations: A Proposed Modification of the Commission's and Judges' Bills," 1976 J.Corp.L. 555; Note, "The Secured Creditor's Right to Full Liquidation Value in Corporate Reorganization," 42 U.Chi.L.Rev. 510 (1975). Even the legislative history of the Code shows sensitivity to these constitutional constraints, albeit in the realm of adequate protection rather than lien avoidance under Section 522(f). *See, e. g.,* H.Rep.No. 95–595, 95th Cong., 1st Sess., 338–339 (1978), U.S.Code Cong. & Admin.News 1978, p. 6295.

*ter* became antonyms for judicial restraint in decisionmaking. R. Berger, Government by Judiciary, 193–94 (1977).

██ Justice Holmes forecast the decline of substantive due process with its interpolation of free enterprise values, including the "sanctity" of "vested" property rights, in his dissent in *Lochner*: The Constitution, he said, "is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the state or of *laissez-faire*. It is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar, or novel, and even shocking, ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States." *Lochner v. New York*, 198 U.S. 45, 75–76, 25 S.Ct. 539, 546–547, 49 L.Ed. 937 (1905) (dissenting opinion). This heterogeneity of views must be articulated at the polls. Hence, the desirability or undesirability of any statutory experiment, particularly in the area of business regulation, is a matter for Congress and not the judicial branch.

Even as *Radford* was pronounced, the emasculation of substantive due process had begun. *Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), for example, upheld price fixing for the sale of milk in New York with a broad disclaimer unhitching due process from its substantive moorings: "The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property." *Id.* at 532, 54 S.Ct. at 514.

In *Lincoln Union v. Northwestern Co.*, 335 U.S. 525, 69 S.Ct. 251, 93 L.Ed. 212 (1949), upholding state right-to-work laws, this process continued: "The *Allgeyer-Lochner-Adair-Coppage* constitutional doctrine was for some years followed by this Court. It was used to strike down laws fixing minimum wages and maximum hours in employment, laws fixing prices, and laws regulating business activities ... This Court beginning at least as early as 1934, when the *Nebbia* case was decided, has

steadily rejected the due process philosophy enunciated in the *Adair-Coppage* line of cases. In doing so it has consciously returned closer and closer to earlier constitutional principles that states have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific constitutional prohibition, or of some valid federal law ... Under this constitutional doctrine the due process clause is no longer to be so broadly construed that the Congress and state legislatures are put in a strait jacket when they attempt to suppress business and industrial conditions which they regard as offensive to the public welfare." *Id.* at 535–537, 69 S.Ct. at 256–257.

In *Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 72 S.Ct. 405, 96 L.Ed. 469 (1952), which upheld a law which penalized employers who deducted wages for time spent voting by employees, the language is emphatic: "The liberty of contract argument pressed on us is reminiscent of the philosophy of *Lochner v. New York* ... which invalidated a New York law prescribing maximum hours for work in bakeries; *Coppage v. Kansas* ... which struck down a Kansas statute outlawing 'yellow dog' contracts; *Adkins v. Children's Hospital* ... which held unconstitutional a federal statute fixing minimum wage standards for women in the District of Columbia, and others of that vintage. Our recent decisions make plain that we do not sit as a superlegislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare. The legislative power has limits ... But the state legislatures have constitutional authority to experiment with new techniques; they are entitled to their own standard of the public welfare; they may within extremely broad limits control practices in the business-labor field, so long as specific constitutional prohibitions are not violated and so long as conflicts with valid and controlling federal laws are avoided ... We could strike down this law only if we returned to the philosophy of the *Lochner*,

*Coppage*, and *Adkins* cases." *Id.* at 423 and 425, 72 S.Ct. at 407 and 408.

The Court came full circle in its deference to legislative prerogative in *Ferguson v. Skrupa*, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963), where it upheld a law forbidding non-attorneys to engage in the business of debt adjustment: "Under the system of government created by our Constitution, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation. There was a time when the Due Process Clause was used by this Court to strike down laws which were thought unreasonable, that is, unwise or incompatible with some particular economic or social philosophy." Noting that this view had "long since been discarded," it emphasized that "this Court does not sit to 'subject the State to an intolerable supervision hostile to the basic principles of our Government and wholly beyond the protection which the general clause of the Fourteenth Amendment was intended to secure.'" Now, "in the face of our abandonment of the use of the 'vague contours' of the Due Process Clause to nullify laws which a majority of the courts believed to be economically unwise ... we emphatically refuse to go back to the time when courts used the Due Process Clause 'to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.' Nor are we able or willing to draw lines by calling a law 'prohibitory' or 'regulatory.' Whether the legislature takes for its textbook Adam Smith, Herbert Spencer, Lord Keynes, or some other is no concern of ours." *Id.* at 729–732, 83 S.Ct. at 1030-1032 (citations omitted). To be sure, as one commentator has observed, "the Supreme Court has now dichotomized due process:" it enjoys a renaissance in the area of personal liberties, but "in the economic sphere the words have become a 'dirty phrase.'" R. Berger, Government By Judiciary, *supra* at 208.[20]

The decline of laissez faire constitutionalism and the rise of judicial restraint are fundamental benchmarks in the history of constitutional law. Adherence to *Radford* under these circumstances is astigmatic; while it may not have been directly overruled, few constitutional anachronisms are; they expire quietly. Disinterring *Radford* will not resurrect substantive due process. It may, as one court suggests, stand "as a venerable and vigorous sentinel of due process rights," *In re Rodrock, supra*, 3 B.R. 629, 6 B.C.D. at 269, but it is a solitary sentinel standing at the watershed of a departed era in constitutional adjudication.[21]

### (c) The Radford Rationale is Inapplicable to Section 522(f).

Even absent the verdict of history, *Radford* is distinguishable from these cases; a security interest in consumer goods is not comparable with a lien on realty. It is true that several courts have rejected this argument, insisting that constitutional rights

---

**20.** For other cases evidencing the decline of substantive due process *see, e. g., West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937); *United States v. Carolene Products Co.*, 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); *Olsen v. Nebraska*, 313 U.S. 236, 61 S.Ct. 862, 85 L.Ed. 1305 (1941); *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941); *Western Reference Bond Assn.*, 313 U.S. 236, 61 S.Ct. 862, 85 L.Ed. 1305 (1941); *Daniel v. Family Ins. Co.*, 336 U.S. 220, 69 S.Ct. 550, 93 L.Ed. 632 (1949); *Secretary of Agriculture v. Central Roig Ref. Co.*, 338 U.S. 604, 70 S.Ct. 403, 94 L.Ed. 381 (1950); *Breard v. Alexandria*, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951); *Williamson v. Lee Optical Co.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

**21.** Funerary texts commemorating the demise of substantive due process are legion. *See, e. g.*, R. Berger, Government By Judiciary, *supra*; B. Wood, Due Process of Law, 1932–1949 (1951); Hamilton, "The Path of Due Process of Law," in American Constitutional Law: Historical Essays, L. Levy, ed., 129 (1966); Hetherington, "State Economic Regulation and Substantive Due Process of Law," 53 Nw.U.L.Rev. 13 (1958); McClosky "Economic Due Process and the Supreme Court: An Exhumation and Reburial," 1962 Sup.Ct.Rev. 34; Rodes, "Due Process and Social Legislation in the Supreme Court—a Post Mortem," 33 Notre Dame Law. 5 (1957); Stern, "The Problems of Yesteryear—Commerce and Due Process, 4 Vand.L.Rev. 446 (1951); Strong, "The Economic Philosophy of Lochner: Emergence, Embrasure and Emasculation," 15 Ariz.L.Rev. 419 (1973).

are not measured in dollars and cents. *E. g., In re Rodrock, supra* 6 B.C.D. at 268. However, this view is defective for two reasons. First, it assumes what it should decide, whether any "right" is substantial enough to carry weight under the Fifth Amendment. Second, it ignores *Radford's* own criterion for what is "substantial"; i. e. "substantial value." *Radford, supra,* 295 U.S. at 601, 55 S.Ct. at 868.

*Radford* posits a hierarchy of property values, with some more deserving than others of constitutional protection: "It is true that the position of a secured creditor, who has rights in specific property, differs fundamentally from that of an unsecured creditor, who has none." *Id.* at 588, 55 S.Ct. at 862.

*Radford* does not say why this distinction is made between secured and unsecured claims. But the most probable basis for this dictum is that some forms of property are worth more than others.

Does a lien on a second-hand portable television worth $200, therefore, enjoy more constitutional protection than an unsecured claim for $11,000,000? Should the lien survive while the contract is wiped out in bankruptcy? If contracts under *Radford* are not commensurate with liens, then perhaps liens secured by personalty, or liens securing nominal dollar amounts are not as important as liens secured by realty, or liens securing large dollar amounts. This logical extension of *Radford* may indeed suggest a *de minimis* determination of rights under the Fifth Amendment.

It is true that both the rationale and implications of this distinction, especially as applied to Section 522(f), may not have yet been plumbed. On one hand, there is no constitutional reason for treating contracts (which are merely another form of property) and liens (which are merely another form of contract) differently in bankruptcy, although Congress, for policy reasons, may choose to do so.

On the other hand, the relativizing tendencies of the *Radford* dictum have no necessary or convenient bounds. While a mortgage and security interest are in form similar, the transactions in *Radford* and here are in substance and purpose distinct. Mortgages may involve tens of thousands of dollars; they are long term and therefore more likely to encounter economic vicissitudes; accordingly, the security must be commensurate with the risk; it must retain its value and be available, if necessary, to collect on the loan. Consumer financing, on the other hand, is generally in small amounts and short term. None of the notes in these cases exceeds $1,800; one is for $800, two are for $500. The security is perishable consumer goods, which as realizable collateral, have nominal value. Examples in these cases include a bookcase, baby crib, and play pen valued by the debtors at $100, $50, and $30. Liens on nonconsumer goods may not be avoided under Section 522(f)(2).[22]

More fundamentally, however, if the legislative history is credited, the consumer lender, unlike the bank in *Radford*, did not take these liens as a hedge against default; they were taken as leverage to insure reaffirmation of the debt. Foreclosing and marshaling the collateral for its value *qua* security were never in the cards, and hence, the rights of mortgagees delineated in *Radford* are not analogous to the interests of consumer lenders. Likewise, the value of the collateral has no independent significance to Avco. Avco argued in oral argument that it deserves, and absent Section 522(f) would pursue, full payment of the debt by the threat to repossess. This is more, of course, than it is entitled to under the rule of *Union Central. See,. e. g.,* H.R. Rep.No.595, 95th Cong., 1st Sess., 127 (1977), U.S.Code Cong. & Admin.News 1978, p. 6088 (The creditor was able "to use the threat of repossession, rarely carried out, to extract more than he would be able to if he did foreclose or repossess"); *In re Primm, supra* at 147–148; *In re Fisher, supra* at

---

**22.** Judicial liens on any property, so long as it is exempt under 11 U.S.C. Section 522(b), may be avoided under Section 522(f)(1). The constitutionality of this provision is not challenged in these cases.

212–213. There can be no preservation of these lien rights apart from their abuse.

Furthermore, Congress recognized that "one of the primary purposes of the bankruptcy act is to 'relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.' This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution that property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934) (emphasis in original and citations omitted).[23]

Liens on exempt property which survive bankruptcy have a stranglehold on this policy. Debtors in theory are "unhampered by the pressure and discouragement of preexisting debt," *Local Loan Co. v. Hunt, supra*, 292 U.S. at 244, 54 S.Ct. at 699, but in reality are burdened by liens on the necessities of life.

Under these circumstances, there is no middle ground upon which to reconcile the protection afforded secured creditors in *Union Central* (on sharply different facts) and the need to provide debtors with a fresh start. A choice between these competing interests had to be made. Congress has made that choice; it is embodied in Section 522(f). This court cannot say that the choice is constitutionally infirm.[24]

*(d) The Radford Rationale Was Incorrectly Applied To The Bankruptcy Clause.*

The predicate of *Radford*, that Congress, under its power to regulate bankruptcies, may provide for the discharge of contracts but may not meddle with liens, overlooks five centuries of principle and practice in bankruptcy.

The importance of this history is emphasized in *Continental, supra*, 294 U.S. at 670, 55 S.Ct. at 603, which explores the scope of the bankruptcy power via legislative usage:

> Probably the most satisfactory approach to the problem of interpretation here in-

**23.** Perhaps ironically, "because it most valued private property for its productive potential," our country "has always made strong, positive use of law to maintain such conditions as it thought essential to the main flow of private activity. Bankruptcy law began mainly as a protection to creditors against the dishonesty of debtors. But in mid-nineteenth century, both in national bankruptcy laws and in state insolvency legislation, the trend of policy was as much to provide means by which debtors might be saved from irretrievable ruin and salvaged as venturers who might yet again contribute productively to the market." J. Hurst, Law and the Conditions of Freedom in the Nineteenth-Century United States, 25 (1956). Variously phrased, this is a "policy in favor of freedom for creative change as against unyielding protection for existing commitments," a "preference for dynamic rather than static property, or for property put to creative new use rather than property content with what it is," a "preference for property as an institution of growth rather than merely of security." *Id.* at 27 and 28. Law, in this view, "must provide a framework within which many may venture, rather than a favored few, and it must take care that future release of creative energy is not barred by the rigidity of old concessions." *Id.* at 29. *Compare Radford, supra*, 295 U.S. at 582, 55 S.Ct. at 859 ("No bankruptcy act had undertaken to supply him [the debtor] capital with which to engage in business in the future"). *See generally* II Story, Commentaries on the Constitution of the United States, M. Bigelow, ed., 48 (1891); Aaron, "The Bankruptcy Reform Act of 1978: The Full-Employment-for-Lawyers Bill, Part II," 1978 Utah L.Rev. 175, 182 n. 32.

**24.** *Radford* may also be distinguishable, first, because the goods here are exempt property, necessary to the survival or livelihood of the debtor. *Compare Radford, supra*, 295 U.S. at 577, 55 S.Ct. at 857 ("There was no claim that the farm was exempt as a homestead or otherwise"). Second, the liens here are non-purchase money security interests. The law has long recognized the peculiar equities involved in the enforcement of purchase money mortgages. *See, e. g.*, VIII Holdsworth, A History of English Law, 243 (1925) ("In this case there is a natural equity that the land should stand charged with so much of the purchase money as was not paid; and that without any special agreement for that purpose"). These equities are preserved under some state exemption statutes which make exceptions for purchase money obligations. *See, e. g.*, Utah Code Ann., § 78–23–3 (1977). *See also In re Curry*, 5 B.R. 282, 287 (Bkrtcy., N.D.Ohio 1980).

volved is to examine [Article I, Section 8, Clause 4] in light of the acts, and the history of the acts, of Congress which have from time to time been passed on the subject; for, like many other provisions of the Constitution the nature of this power and the extent of it can best be fixed by the gradual process of historical and judicial "inclusion and exclusion."

If the past is an index to constitutionality, *Radford's* distinction between contracts and liens is thin.[25] Even more rarefied, however, is the assertion that bankruptcy has never involved the avoidance of liens.

"Equality is equity," it has been said, "is a beguiling slogan." 2 Gilmore, Security Interests in Personal Property, § 45.2 at 1287 (1965). Nevertheless, if bankruptcy has an undergirding principle, and one which is inimical to lien rights, it is equality among creditors.[26]

In 1542, Henry Brinklow bemoaned a "parcyell lawe in making of tachmentys (attachments), first come, first servyd; so

---

**25.** There is confusion whether the distinction drawn is between contracts and liens, or between impairment and extinction of contracts or liens, or between rights and remedies of contracts or liens. The impairment-extinction reading is given by *Kuehner v. Irving Trust Co.,* 299 U.S. 445, 57 S.Ct. 298, (1937) which, after citing *Radford,* notes that "the Fifth Amendment *forbids the destruction of a contract.*" *Id.* 299 U.S. at 452, 57 S.Ct. at 301 (emphasis supplied). Other courts, taking their cue from Kuehner, have agreed. *See, e. g., In re Hoops, supra,* 3 B.R. 635, 6 B.C.D. at 275–276.

But *Radford* ruled that the prohibition against destroying contracts applies only to the states and does not impede the federal bankruptcy power. *Radford, supra,* 295 U.S. at 589, 55 S.Ct. at 863. This has been understood for almost two centuries. *See, e. g.,* II Story, Commentaries on the Constitution of the United States, *supra* at 51–52; *Hanover National Bank v. Moyses, supra* 186 U.S. at 188, 22 S.Ct. at 860; *Legal Tender Cases,* 79 U.S. 457, 579, 12 Wall. 457, 579, 20 L.Ed. 287 (1870) ("Nor can it be hereby asserted that Congress may not, by its action, indirectly impair the obligation of contracts, if by the expression be meant rendering contracts fruitless or partially fruitless. *Directly it may confessedly, by passing a bankruptcy act, embracing past as well as future transactions. This is obliterating contracts entirely*"). (Emphasis supplied.) Indeed, this power to "obliterate" was arguably extended to liens in *Wright, supra* 304 at 517, 58 S.Ct. at 1033.

The right-remedy dichotomy originated in *Radford, supra* 295 U.S. at 583, 55 S.Ct. at 860, but was scrapped in *Vinton Branch, supra,* which held that Congress could empower courts to "affect the interests of lien holders in many ways." The question under these circumstances would not be "whether the legislation does more than modify remedial rights. It is whether the legislation modifies the secured creditor's rights, remedial or substantive, to such an extent as to deny the due process of law guaranteed by the Fifth Amendment." *Id.* 300 U.S. at 470, 57 S.Ct. at 565. In one blow, this language disavows the sanctity of liens; it likewise annuls the distinction for due process

purposes between substantive and remedial rights. *See also* Rosenberg, *supra* at 523 ("Such a standard is hopelessly circular: if the deprivation results in loss, or a real potential of loss, to the secured creditor, it must be substantive").

Finally, the distinction between contracts and liens is not only unsupported in *Radford* but probably indefensible under the Fifth Amendment. "Liberty of *contract*" was the polestar of substantive due process enthusiasts in their hey-day. *See, e. g.,* Roche, "Entrepreneurial Liberty and the Fourteenth Amendment," in American Economic History: Essays in Interpretation, S. Cohen and F. Hill, eds., 410–434 (1966). The concept of "property" under the Fifth Amendment, which is "broad" and "majestic" and not subject to "rigid or formalistic limitations," *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 568, 92 S.Ct. 2701, 2704, 33 L.Ed.2d 548 (1974), encompasses even contracts of indefinite substance. *See, e. g., Connell v. Higgenbotham,* 403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971) (teacher without tenure or formal contract); *Slochower v. Board of Education,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952). *Cf. Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (recipient of welfare benefits). One case even relies on *Radford* for the proposition that *unsecured* creditors have rights in property which are constitutionally protected in bankruptcy. *See In re Boston & M. Corp.,* 484 F.2d 369, 374 (1st Cir. 1973).

**26.** Creditors early recognized the disadvantages of "race" and other preferential systems of debt collection. These systems favored local at the expense of distant creditors, and encouraged fraud. Failure of a single merchant was likely to create a chain reaction of insolvencies, otherwise preventable through equitable allocation of his estate. This, in turn, encouraged litigation, forced sales at depressed prices, escalations in the cost of business, and a tightening of credit. *See,* e. g., P. Coleman, Debtors and Creditors in America, *supra* at 12–13.

one of if shall be all payd, and the rest shal have nothyng." To forestall such inequity, he recommended laws which would provide that "the most in number of the credytors and most in somme, shal bynde the rest to doo and gyve lyke tyme as doo the most of the credytors. And if it be duly found that the man be so farre at after deale, that he be not able to pay his whole credite in reasonable tyme, than the lawe may bynd them that every man may have pound and pound alyke, farre as his goodys will goo." This was a law both 'neyhborly and godly." VIII Holdsworth, A History of English Law, 232 (1925).

England accepted Brinklow's advice, and the principle of equality superseded liens in the distribution of bankruptcy estates: "The estate must be rateably divided among the creditors. This rule of equal division was applied, even though a creditor had a judgment, statute, recognizance, specialty, attachment, or other security." *Id.* at 239. Indeed, the principle was so entrenched that it found expression in Blackstone: "This dividend to creditors from the estate must be made equally and in a ratable proportion to all the creditors, according to the *quantity* of their debts; no regard being had to the *quality* of them." The only exceptions to this rule were mortgagees and pledgees in possession of their security, because only the "equity of redemption" in such property passed to the estate. "But, otherwise, judgments and re-cognizances, (both of which are debts of record, and therefore at other times have a priority,) and also bonds and obligations by deed or special instrument, (which are called debts by specialty, and are usually the next in order,) these are all put on a level with debts by mere simple contract, and all are paid *pari passu* [in equal degree]." 1 Blackstone, Commentaries on the Laws of England in Four Books, W.D. Lewis, ed., 945 (1922) (emphasis in original).

Our first bankruptcy legislation used English statutes as a model. Section 31 of the Bankruptcy Act of 1800 provides in terms reminiscent of Blackstone that (with the exception of executions levied prior to bankruptcy) "in the distribution of the bankrupt's effects there shall be paid to every one of the creditors a portion-rate, according to the amount of their respective debts, so that every creditor having security for his debt by judgment, statute, recognizance, or specialty, or having an attachment under any of the laws of the individual states, or of the United States, on the estate of such bankrupt ... shall not be relieved upon any such judgment, statute, recognizance, specialty, or attachment, for more than a rateable part of his debt, with the other creditors of the bankrupt."

This "leveling" of distinctions between secured and unsecured creditors in the distribution of the estate remained popular throughout the nineteenth century in America,[27] but was replaced in large meas-

27. Early American practice varied among the colonies and states, but the emphasis on equality among creditors was constant. *See* II Story, Commentaries on the Constitution of the United States, *supra* at 49; II Kent, Commentaries on American Law, J.M. Gould, ed., 397–398 (14th ed. 1896) ("A difficulty exists in Massachusetts in respect to their attachment and insolvent laws. A process of attachment of the goods of the debtor on *mesne* process, in that state, has existed since 1789, but their insolvent law dissolves the attachment, on the debtor being placed under the operation of that system, either by his voluntary act or by the act of his creditors, and which system aims at equal distribution among the creditors").

Sponsors of bankruptcy legislation in 1819 argued: "What is a bankruptcy law but a system of national policy, interwoven with humanity and justice, in the nature of a general com-promise between debtor and creditor, giving to the former a discharge from all his debts, on condition of his surrendering up to the latter all his goods and effects in good faith, *without any distinction of creditors and debts*, whether of an honest or honorary nature—whether they had their origin in the endorsement of notes, or in money lent, or in the sale of goods ... By the operation of a bankrupt law, *all partial assignments are annulled*, and the goods and effects of an insolvent are all subject to the debts of all his creditors, *without any distinction*, with the exception of those of the United States, which have a preference ... *This law places all private contracts on the same foundation*, and thereby gives greater safety to confidence, greater security to credit, and greater stability to commerce, by making all engagements and all responsibilities, no matter how private or confidential in their nature, subser-

ure by the institution of the trustee who has been the nemesis of many liens in bankruptcy. *See, e. g.,* 2 G. Gilbert, Security Interests in Personal Property, *supra,* § 45.2 at 1286–1289.

The trustee's roots, as well as his powers are nearly coextensive with the principle of equality among creditors; they can be traced to England where the law carried "the lien of the assignees of the bankrupt back to the time of the act of bankruptcy committed, so that the sheriff, who *fi. fa.* seizes and sells the goods of the bankrupt before the commission issued, but after the act of bankruptcy committed, and without notice of the act of bankruptcy, becomes liable in trover to the assignees, inasmuch as the assignment has relation back to the act of bankruptcy, and vests the title to the property in the assignees from that time." II Kent, Commentaries on American Law, J. M. Gould, ed., 634–635 (14th ed. 1896). *See also* 1 Blackstone, Commentaries on the Laws of England in Four Books, *supra* at 944–945; VIII Holdsworth, A History of English Law, *supra* at 229–230 n. 6, 236 · 237, and 239–240.

Each of the nineteenth century statutes in America allowed the avoidance of such liens, and the procedure noted above has a modern counterpart in Uniform Commercial Code, Section 9 ·301, and Bankruptcy Act, Section 70(c), former 11 U.S.C. Section 110(c), which subordinate unperfected security interests to lien creditors including a trustee in bankruptcy. The trustee could likewise invoke Bankruptcy Act, Section 67(a), former 11 U.S.C. Section 107(a), to avoid judicial liens obtained within a period of four months before the petition. Indeed, in *Chicago, Burlington & Quincy R. Co. v. Hall,* 229 U.S. 511, 33 S.Ct. 885, 57 L.Ed. 1306 (1913) the Supreme Court held that under some circumstances judicial liens on exempt property may be invalidated under the auspices of this section for the benefit of the bankrupt. *Compare Radford, supra* 295 U.S. at 589, 55 S.Ct. at 863.

Additionally, the Act in Section 60(a), former 11 U.S.C. Section 96(a), interdicts preferences, in the form of security interests, given to satisfy antecedent debts to creditors having notice of the debtor's insolvency and within four months of the petition. Under Section 67(c)(1)(C), former 11 U.S.C. Section 107(c)(1)(C), landlord's liens are relegated to the nether world of unsecured claims. Finally, the trustee in some cases may annul a "statutory lien" arising

---

vient to justice: to the merchant more safety and security in the sale of his goods on credit, *from the consideration of his participating in a rateable proportion of the effects of the debtor in case of his misfortunes, and that no partial disposition of them can be made consistent with the provisions of the law."* Civis (pseudonym), Remarks on the Bankrupt Law: To Which Are Added, The Proposed Amendments of Hopkinson and Webster, *supra* at 9, 46, 47, and 57 (emphasis supplied).

The Acts of 1867 and 1898 in some degree also provided for the extinction of liens which existed at the time of bankruptcy. *See* C. Warren, Bankruptcy in United States History, *supra,* at 189 n. 70.

Even the practice of imprisonment for debt which persisted in America well into the nineteenth century, provides an analogue for lien avoidance in bankruptcy.

Anciently, the borrower was *nexus* to his creditor, which meant that his person was pledged for repayment of the loan. Failure to pay could mean incarceration and the slave block. "The proverb 'He who cannot pay with his purse, pays with his skin' had a ruthlessly literal application." G. Sullivan, The Boom in Going Bust: The Threat of a National Scandal in Consumer Bankruptcy, 25 (1968). Imprisonment for debt continued in England and America. Indeed, this means of enforcing claims was preferred by debtor and creditor alike. For debtors, in an agrarian economy, land was the most important resource and remained productive despite a tenure in prison. For creditors, where there was a limited market for land, it was better to imprison a debtor in the hope that friends would pay his debt. W. Nelson, Americanization of the Common Law, 148 (1975). But a discharge in bankruptcy brought release: a debtor had "an indemnity granted him of being free and discharged forever from all debts owing by him at the time he became a bankrupt; even though judgment shall have been obtained against him, and he lies in prison upon execution for such debts." 1 Blackstone, Commentaries on the Laws of England in Four Books, *supra* at 943; VIII Holdsworth, A History of English Law, *supra* at 230–231. Given the nature and purpose of imprisonment for debt, discharge under these circumstances is remarkably akin to lien avoidance under Section 522(f).

from a seller's reclamation right under Uniform Commercial Code, Section 2–702(2). *See generally*, R. Henson, Secured Transactions, § 7–2 (1979).

This history of lien avoidance has been noted and approved in the context of constitutional challenges to Section 75(s) of the Frazier-Lemke Act in *Wright, supra* 304 U.S. at 517, 58 S.Ct. at 1033: "Bankruptcy proceedings constantly modify and affect the property rights established by state law. A familiar instance is the invalidation of transfers working a preference, though valid under state law when made." It is carried forward in the Code; 11 U.S.C. Sections 544, 545, 547, and 548 repose substantial lien revocation powers in the trustee. The debtor shares these powers to some extent under 11 U.S.C. Section 522(g) and (h).[28]

These liens are indistinguishable in any constitutional sense from the liens of Avco. Their avoidance, as preferences, or otherwise, is more radical than the debtor relief contemplated in *Radford* and no harsher than that proposed here.

For that matter, no distinction on substantive grounds is maintainable between lien avoidance in *Radford* and lien prevention by enactment or amendment of state exemption statutes which forbid execution, or the concept of discharge which enjoins post-bankruptcy collections. The fact that one has a consensual and the other a judicial origin is immaterial; the will of individuals is no more sacred than a decree of court; both are the products of statutes which authorize and regulate the rights in question. The argument that Congress has power to exempt a debtor's property, discharge his obligations, and forbid executions, but cannot excuse that property from outstanding lien rights elevates form over substance. *See* Martin, "Substantive Regulation of Security Devices Under the Bankruptcy Power," 58 Col.L.Rev. 62 (1948). *Cf.* C. Warren, Bankruptcy in United States History, *supra* at 156–159.

A holding that liens are nonavoidable under Section 522(f) on due process grounds calls into question the entire history of lien avoidance in bankruptcy as well as the entire framework of the Code. The fact that due process and lien avoidance have coexisted since the Sixteenth Century, with the momentary aberration of *Radford*, requires the conclusion that Section 522(f) does not offend our "deepest notions of what is fair and right and just," *Solesbee v. Balkcom*, 339 U.S. 9, 16, 70 S.Ct. 457, 460, 94 L.Ed. 604 (1950), or "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). Liens, like other contract and property interests, are not inviolable, but subject to congressional power to regulate bankruptcies.

## CONCLUSION

On balance, in these cases, it cannot be maintained that there exist substantive rights protected under the due process clause, which outweigh the congressional prerogative to regulate bankruptcies as expressed in Section 522(f). The Constitution, at most, requires a rational connection between Section 522(f) and the purpose for which it is enacted. The law meets this

---

**28.** This discussion of lien avoidance is illustrative, not exhaustive. *See generally* 2 G. Gilbert, Security Interests in Personal Property, *supra*, at §§ 45.1 *et seq.*; R. Henson, Secured Transactions, *supra* at §§ 7–1 *et seq.*; J. MacLachlan, Handbook of the Law of Bankruptcy, 253–336 (1956); J. White & R. Summers, Handbook of the Law under the Uniform Commercial Code, 864–897 (1972); Aaron, "The Bankruptcy Reform Act of 1978: The Full-Employment-For-Lawyers Bill, Part IV," 1980 Utah L.Rev. 19; Hagedorn, "The Survival and Enforcement of the Secured Claim Under the Bankruptcy Reform Act," 54 Am.Bank.L.J. 1 (1980); Henson, "The Uniform Commercial Code and the New Bankruptcy Act: Some Problem Areas," 35 Bus.Law. 83 (1979); Kaye, "Preferences Under the New Bankruptcy Code," 54 Am.Bank.L.J. 197 (1980); Kennedy, "The Secured Lender and the Bankruptcy Act," 2 U.C.C.L.J. 13 (1968); Levin, "An Introduction to the Trustee's Avoiding Powers," 54 Am.Bank.L.J. 173 (1979); Young, "Preferences Under the Bankruptcy Reform Act of 1978," 54 Am.Bank.L.J. 221 (1980).

test: Congress researched, identified, and made findings concerning what in its view were evils in the credit industry; Section 522(f) is drafted and delimited to meet these evils. Given the presumption of constitutionality afforded legislation of this type, it would be inappropriate to conclude that a rational relationship between Section 522(f) and the elimination of these evils does not exist. Moreover, the tradition of lien avoidance to implement the policies of bankruptcy, such as equality among creditors, or in this instance, debtor rehabilitation suggests no irreconcilable conflict with the Fifth Amendment. For these reasons, Section 522(f) is constitutional. The motions to dismiss are denied.